**GENERAL MOTORS CORPORATION, d/b/a General Motors Emissions Laboratory, Plaintiff–Appellee/Cross–Appellant,**

v.

**The CITY AND COUNTY OF DENVER, Tami A. Tanoue, as Hearing Officer for the Manager of Revenue of the City and County of Denver, State of Colorado; and Cheryl Cohen, as the Manager of Revenue of the City and County of Denver, State of Colorado, Defendants–Appellants/Cross–Appellees.**

No. 98SA220.

Supreme Court of Colorado, En Banc.

Dec. 6, 1999.

---

Morrison & Foerster, LLP, Thomas H. Steele, Amy L. Silverstein, Neil I. Pomerantz, Denver, Colorado, Attorneys for Plaintiff–Appellee/Cross–Appellant.

Daniel E. Muse, City Attorney, Robert F. Strenski, Assistant City Attorney, Denver, Colorado, Attorneys for Defendants–Appellants/Cross–Appellees.

Justice KOURLIS delivered the Opinion of the Court.

In this case, we determine whether the City and County of Denver (Denver) may impose a use tax on automobiles owned by General Motors Corporation (GM) and used in Denver for 1 to 4% of their total useful life. We hold that the Commerce Clause does not prohibit such a tax, subject to the limitation that Denver's tax must be offset by a credit for any sales or use taxes on the wholesale value of the parts and materials

used to construct the vehicles that GM may have incurred for purchases or uses in foreign states prior to their arrival in Denver. We then consider whether GM is entitled to either of two statutory exemptions from the Denver use tax, and hold that it is not.

## I.

In 1995, the Denver Manager of Revenue conducted a tax audit of the Denver operations of GM for the period of January 1, 1989 to August 31, 1994. GM is a Delaware corporation with headquarters in Detroit, Michigan. During the audit period, GM's Powertrain Division operated the Denver Vehicle Emissions Testing Lab (the Denver Lab). The Powertrain Division brought approximately one-thousand vehicles to the Denver Lab each year, with an average of twenty to thirty vehicles at the lab each day. Following its audit of GM's Denver operations, the Manager of Revenue imposed a 3.5% use tax on approximately 82% of the vehicles that had passed through the lab between 1989 and 1994.[1] The taxed vehicles fell into three groups: emissions test vehicles, powertrain drive development vehicles, and "drive trip" test vehicles.

Emissions test vehicles, comprising 40% of the vehicles, represented the largest of the three groups. To create the emissions test vehicles, the Powertrain Division acquired current production model automobiles from GM's assembly lines in Michigan and refit the vehicles to simulate production models planned for a future year. The prototype vehicles then spent eight to twenty months in Michigan, undergoing performance stabilization and testing. Then, the Powertrain Division shipped them via common carrier to the Denver Lab. While in Denver, engineers ran the vehicles through approximately two weeks of high altitude emissions testing, both in the lab and on the roads of Denver and the surrounding mountains, before shipping the vehicles to other GM test centers in the United States and Canada. After an average test life of thirty-five months and twelve-thousand miles, during which GM occasional-

ly brought the vehicles back to Denver, GM returned the vehicles to Michigan and either scrapped them, or sold them at auction. On average, the emissions test vehicles spent 2 to 4% of their useful lives in Denver and traveled 1.5% of their total miles in Denver.

Unlike the emissions test vehicles, the powertrain drive development vehicles, comprising 32% of the vehicles, did not undergo any testing in the Denver Lab. Rather, the Powertrain Division shipped these vehicles to the Denver Lab, where they sat for a short period——usually less than a few days—— before engineers drove them into the mountains for road testing.

Lastly, drive trip test vehicles, comprising 10% of the vehicles, were vehicles that GM's engineers tested while driving on road trips across the country.[2] The Denver Lab served as a drop-off point for these vehicles, where lab personnel washed and performed minor maintenance on them before shipping them to other locations, usually within a matter of a few days. Both the powertrain drive development and drive trip test vehicles spent less than 1% of their useful lives and total miles in Denver.

Following its audit of these operations, Denver issued GM a notice of use tax deficiency totaling $2,868,632.96 based on the full value of the vehicles that passed through Denver. Subsequently, pursuant to this court's holding in *International Business Machines Corp. v. Charnes*, 198 Colo. 374, 601 P.2d 622 (1979), Denver issued a modified assessment for $1,044,199.16 based on the full value of the materials used to construct the vehicles, rather than the full retail value of the completed vehicles. This modified figure included an interest charge and a 10% tax penalty of $70,345.34 pursuant to D.R.M.C. § 53–114(a) (1993) for late remittance.

Denver provided GM with a tax credit under D.R.M.C. § 53–92(c) (1993) for any sales or use taxes paid by GM *to other municipalities* on the materials costs of the vehicles *prior to* the vehicles' arrival in Den-

---

1. GM does not contest the tax imposed by Denver on the other 18% of the vehicles that passed through the Denver Lab.

2. *See supra* note 1.

ver.[3] Pursuant to that provision, however, Denver declined to credit any portion of foreign taxes paid on the value of the labor and overhead used to complete the vehicle or any taxes imposed on the vehicles *after* their departure from Denver. Denver calculated the proper credit to be $4,924.37, as compared to GM's total tax payments of $981,413.82 to other jurisdictions for uses before the vehicles were in Denver and after their departure.

GM contested Denver's assessment in a formal hearing before the Manager of Revenue, arguing that the use tax violated the Commerce Clause of the United States Constitution[4] because it was not fairly apportioned and lacked a sufficient nexus to GM's initial purchase of the vehicles in Michigan. As such, GM contended that its activities should be exempt from the use tax under D.R.M.C. § 53–97(11) (1993), which excludes "[a]ll sales which the city is prohibited from taxing under the Constitution." *Id.* Alternatively, GM argued that its activities fell within two other municipal code exemptions. *See* D.R.M.C. § 53–97(9) (1993) (granting an exemption for temporary personal use within Denver); D.R.M.C. § 53–97(12) (1993) (granting an exemption for vehicles registered outside of Denver). The hearing officer affirmed the assessment of the tax in its entirety, finding that it did not violate the Commerce Clause and that GM was not entitled to claim either exemption to the tax. On review, the Denver District Court struck down the assessment, holding that GM fell within the D.R.M.C. § 53–97(9) temporary personal use exemption. In addition, anticipating an appeal concerning the application of that exemption, the district court addressed GM's constitutional arguments. The court found that Denver did not have a sufficient nexus to the Powertrain Division's original "purchase" of the parts and materials that comprised the vehicles. In addition, the court found that the tax was not "externally consistent" because it was not apportioned in a fashion that accounted for the fact that the vehicles spent only a small portion of their useful lives in Denver.

We have appellate jurisdiction pursuant to section 13–4–102(1)(b), 5 C.R.S. (1999), and we now affirm in part, reverse in part, and remand for a determination of the proper credit for the sales and use taxes paid by GM prior to the vehicles' arrival in Denver.

## II.

Denver's municipal use tax is set forth in D.R.M.C. § 53–96(1) (1993), which states:

> There is levied and there shall be collected and paid a tax in the amount stated in this article, by every person exercising the taxable privilege of storing, using, distributing or consuming in the city a service subject to the provisions of this article or any article of tangible personal property, purchased at retail, for said exercise of said privilege, as follows: (1) On the purchase price paid or charged upon all sales and purchases of tangible personal property.

*Id.* The code defines "use" as: "the exercise, *for any length of time,* by any person within the city of any right, power or dominion over tangible personal property or services." D.R.M.C. § 53–95(30) (1993) (emphasis added). It defines storage as "any keeping or

---

3. D.R.M.C. § 53–92(c) states:

> It is hereby declared to be the legislative intent of the city ... that the provisions of this article shall apply to any person who has already paid a retail sales tax or a use tax in respect to the sale of a service or tangible personal property taxable hereunder, to a municipal corporation organized and existing under the authority of the laws or the Constitution of any state in an amount less than the tax imposed by this article, and who thereafter causes a service or tangible personal property, taxable hereunder, to be used, stored, distributed or consumed in the city, but the tax imposed by this article shall, in such event, be measured by the difference between the amount imposed by this article and the amount previously imposed by the other municipality on said sale. If the retail sales tax imposed and paid to such municipal corporation aforesaid is equal to or more than the tax imposed by this article, no tax shall be due hereunder for the exercise of the privilege of using, storing, distributing or consuming such service or personal property in the city.
> *Id.*

4. *See* U.S. Const. art. I, § 8, cl. 3 (stating that Congress shall have the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes").

retention of, or exercise of dominion or control over, or possession for any length of time of tangible personal property." D.R.M.C. § 53–95(23) (1993). Finally, the code defines "retail sale" as "any sale ... except a wholesale sale," D.R.M.C. § 53–95(19) (1993), where a wholesale sale is defined in relevant part as "[a] sale by wholesalers to licensed retail merchants ... or other wholesalers for resale." D.R.M.C. § 53–95(31)(a) (1993).

By these definitions, the use tax code "reflects a broad legislative intent to impose sales taxes or use taxes upon the great majority of purchases of tangible personal property." *A.B. Hirschfeld Press, Inc. v. City & County of Denver*, 806 P.2d 917, 920 (Colo. 1991). "The definition of retail sale is broadly inclusive, encompassing all sales except wholesale sales. The use tax is to be imposed on the purchase price of all tangible personal property that is purchased at retail for use, storage, distribution or consumption." *Id.*

This broad scope reflects the purpose of the Code. We have previously noted that "Denver's use tax is intended to prevent individuals and businesses from purchasing property in another jurisdiction in order to avoid paying a sales tax in Denver." *Winslow Constr. Co. v. City & County of Denver*, 960 P.2d 685, 692 (Colo.1998). Use taxes such as this one arose shortly after the advent of sales taxes in the 1930s as a means to "safeguard State sales tax revenues from erosion by purchases of goods outside the State, and to protect local merchants from loss of business to border and other States that either have no sales tax or whose sales tax rate is lower than that of the merchant's State." 2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 16.01 (1992) [hereinafter 2 Hellerstein & Hellerstein].

The United States Supreme Court has upheld the constitutionality of these so-called "compensating use taxes" since their inception, based on the theory that the taxes fall upon an in-state event: the use, storage, consumption, or distribution of property within the state. *See McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944) ("A sales tax is a tax on the freedom of purchase.... A use tax is a tax upon the enjoyment of that which was purchased."); *Henneford v. Silas Mason Co.*, 300 U.S. 577, 587–88, 57 S.Ct. 524, 81 L.Ed. 814 (1937) (upholding the constitutionality of an early California use tax).

■ As Denver recognized in its modified tax assessment, under Colorado law, the use tax base is not the retail value of GM's vehicles, but rather the value of the component parts. *See International Bus. Machs. Corp. v. Charnes*, 198 Colo. 374, 379, 601 P.2d 622, 626 (1979). In *IBM,* we noted that when a manufacturer withdraws a product from its inventory for its own use, the parts and materials that the manufacturer used to build that product no longer qualify for a manufacturing exemption to the Colorado sales and use tax. *See id.* at 378, 601 P.2d at 625. As such, at the time of the withdrawal, the original wholesale purchase is converted to a retail purchase for purposes of the use tax. *See id.* at 378–79, 601 P.2d at 625–26. Because the original exempt purchases were for parts and materials, in *IBM* we held that the Colorado Department of Revenue could tax the value of the parts and materials, but not the "full finished cost" of the completed product. *See id.* at 379, 601 P.2d at 626. We noted that taxing the full finished cost would "have the effect of taxing the company's labor and overhead," and thus, would effectively operate as a "value added tax." *Id.* at 377, 601 P.2d at 624–25. In other words, such a value-added tax would exceed the intended purposes of the use tax because it would more than offset the sales tax revenues due to Colorado if the taxpayer purchased the parts and materials in-state.

The parties do not dispute that the Denver use tax, if constitutional, applies on its face to the parts and materials in GM's test vehicles. Their dispute concerns first, whether the tax as applied is constitutional under the dormant Commerce Clause; and second, whether, even if the tax is constitutional, it nonetheless cannot be collected because of statutory exemptions to the use tax.

### III.

■ We turn first to the constitutionality of the tax under the Commerce Clause. In

this regard, we conduct a de novo review of the district court's constitutional determinations. *See People v. District Court*, 953 P.2d 184, 187 n. 4 (Colo.1998) ("A constitutional standard is a question of law subject to de novo review on appeal.").

■ Although states may tax intrastate commerce as they deem fit, the Constitution imposes limitations on the exercise of state taxing power over interstate commerce. The United States Supreme Court explained the constitutional origin of these limitations in *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995):

> Despite the express grant to Congress of the power to "regulate Commerce ... among the several States," U.S. Const., Art. I, § 8, cl. 3, we have consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject. We have understood this construction to serve the Commerce Clause's purpose of preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear. The provision thus reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.

*Id.* at 179–80, 115 S.Ct. 1331 (some citations and internal quotation marks omitted). The dormant Commerce Clause does not, however er, "immunize" interstate commerce and its instrumentalities from state taxation: indeed, "[f]requently it has been said that interstate business must pay its way." *Michigan–Wisconsin Pipe Line Co. v. Calvert*, 347 U.S. 157, 165, 74 S.Ct. 396, 98 L.Ed. 583 (1954).

■ Under the Supreme Court's holding in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), a state tax does not offend the dormant Commerce Clause if it meets four requirements: (1) it applies to an "activity with a substantial nexus with the taxing State"; (2) it is "fairly apportioned"; (3) it "does not discriminate against interstate commerce"; and (4) it is "fairly related to the services provided by the State." [5] *Id.* at 279, 97 S.Ct. 1076. The district court held that Denver's tax violated the first two prongs of this test.

### A.

■ We turn then to the first prong of the *Complete Auto* test: whether, in this case, Denver's use tax applies to an "activity with a substantial nexus with the taxing State." *Id.* at 279, 97 S.Ct. 1076. Under this test, a jurisdiction may impose a tax obligation so long as "facts demonstrate some definite link, some minimum connection, between the State and the person it seeks to tax." *National Geographic Soc'y v. California Bd. of Equalization*, 430 U.S. 551, 561, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977) (internal quotation marks omitted).

As this test suggests, the "sufficient nexus" requirement does not pose a particularly difficult hurdle for most state taxes. For instance, in *Standard Pressed Steel Co. v. Department of Revenue of Washington*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975), the Supreme Court upheld an unapportioned gross receipts tax that Washington State imposed on the in-state sales of an out-of-state corporation, even though the company had

---

**5.** Local taxing authorities, like states, are subject to the negative Commerce Clause and the *Complete Auto* test. *See Dean Milk Co. v. City of Madison*, 340 U.S. 349, 353–57, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (striking Madison's sale of milk ordinance on Commerce Clause grounds); *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 64 Cal.App.4th 1217, 76 Cal.Rptr.2d 297, 300–01 (1998) (denying a Commerce Clause challenge to a city's parking tax); *Allegro Servs., Ltd. v. Metropolitan Pier & Exposition Auth.*, 172 Ill.2d 243, 216 Ill.Dec. 689, 665 N.E.2d 1246, 1256–60 (1996) (upholding an airport departure tax imposed by the Metropolitan Pier and Exposition Authority).

only a single full-time employee working from his home in Washington. Standard Pressed Steel argued that its "in-state activities were so thin and inconsequential as to make the tax" unconstitutional, but the Court characterized this argument as "verg[ing] on the frivolous." *Id.* at 562, 95 S.Ct. 706. The Court noted that the full-time employee "made possible the realization and continuance of valuable contractual relations" between Standard Pressed Steel and a large instate corporation, the Boeing Company. *Id.; see also Talbots, Inc. v. Schwartzberg,* 928 P.2d 822, 825 (Colo.App.1996) (holding that the Denver municipal use tax met the first prong of *Complete Auto* where Denver imposed it upon catalog mailings from a department store having two retail outlets in Denver).

■ In fact, it is only where a state's contacts with interstate commerce are truly de minimis that the first prong of *Complete Auto* will operate to invalidate a tax. *See, e.g., Quill Corp. v. North Dakota,* 504 U.S. 298, 317–18, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (concluding that a mail order business's lack of any physical presence in the state precluded the state from collecting a use tax); *United Air Lines, Inc. v. Mahin,* 410 U.S. 623, 631, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973) (stating in dicta that a state would have an insufficient nexus to tax an airplane's consumption of fuel based solely on the aircraft's flight over the state); *National Bellas Hess, Inc. v. Department of Revenue of Illinois,* 386 U.S. 753, 758–60, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967) (holding that a state had an insufficient nexus to require an out-of-state mail order firm to collect and pay use taxes where the firm's only contacts with the state constituted catalogs and merchandise mailed to state residents), *overruled in part on other grounds by Quill Corp.,* 504 U.S. at 306–08, 112 S.Ct. 1904.

Here, in considering the first prong of *Complete Auto,* the district court held:

There is no doubt General Motors has a presence in the City and County of Denver, the question is whether there is a substantial nexus between the City and the *sale of parts* which the City now wishes to tax.

The City's argument fails to establish that there is a substantial nexus between the City and the transaction that it wishes to tax.

(emphasis added). We hold that the trial court's reading of the first prong of the *Complete Auto* test was misdirected. The use tax does not tax the out-of-state *sale* of parts; rather, its incidence falls upon the in-state storage, use, distribution, or consumption of those parts. *See* D.R.M.C. § 53–96(1) (imposing Denver's use tax on the privilege of storing, using, distributing, or consuming property within the city); *Henneford v. Silas Mason Co.,* 300 U.S. 577, 587, 57 S.Ct. 524, 81 L.Ed. 814 (1937) (rejecting a challenge that a use tax violated the Commerce Clause where the challenge asserted that the tax "though in form upon the use, was in fact upon the foreign sale, and not upon the use at all, the form being a subterfuge"). Thus, it is GM's in-state storage, use, distribution, or consumption of automobile parts that must bear a substantial nexus with Denver. *See Complete Auto,* 430 U.S. at 279, 97 S.Ct. 1076.

■ On this point, we find that GM's use and storage of over one-thousand vehicles per year, with the company's corresponding employment of state residents and its operation of the Denver Lab facilities, created a sufficient nexus with Denver. Thus, we conclude that Denver's imposition of the use tax did not violate the first prong of the *Complete Auto* test.

### B.

■ We turn then to the second prong of *Complete Auto,* and the more difficult question in this case: whether Denver's use tax is "fairly apportioned." *Id.* at 279, 97 S.Ct. 1076. The "central purpose" of this prong is to " 'ensure that each State taxes only its fair share of an interstate transaction.' " *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 184, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (quoting *Goldberg v. Sweet,* 488 U.S. 252, 260–61, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989)). In *Jefferson Lines,* the Supreme Court observed:

This principle of fair share is the lineal descendant of [the] prohibition of multiple taxation, which is threatened whenever one State's act of overreaching combines with the possibility that another State will claim its fair share of the value taxed: the portion of value by which one State exceeded its fair share would be taxed again by a State properly laying claim to it.

*Jefferson Lines*, 514 U.S. at 184–85, 115 S.Ct. 1331. The Supreme Court examines the "threat of malapportionment" by making two somewhat interrelated inquiries: "whether the tax is 'internally consistent' and, if so, whether it is 'externally consistent' as well." *Id.* at 185, 115 S.Ct. 1331. We examine each of these requirements in turn.

 A state tax is internally consistent if it is structured "so that if every State were to impose an identical tax, no multiple taxation would result." *Goldberg,* 488 U.S. at 261, 109 S.Ct. 582.

A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax.

*Jefferson Lines,* 514 U.S. at 185, 115 S.Ct. 1331. To avoid multiple taxation, a tax upon interstate commerce must either be apportioned to relate the tax to the activity taking place within the taxing state or it must allow a credit for other similar taxes paid by the taxpayer in other jurisdictions. *See Goldberg,* 488 U.S. at 264, 109 S.Ct. 582. Either method is equally suitable as a means of meeting the "fairly apportioned" prong of *Complete Auto. See Jefferson Lines,* 514 U.S. at 195, 115 S.Ct. 1331 (rejecting "the idea that a particular apportionment formula must be used simply because it would be possible to use it"). Furthermore, the fairly apportioned test "does not require [the] State to adopt a tax which would 'pose genuine administrative burdens.'" *Goldberg,* 488 U.S.

at 264, 109 S.Ct. 582 (quoting *American Trucking Ass'ns, Inc. v. Scheiner,* 483 U.S. 266, 296, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987)).

 Indeed, as we discuss further *infra,* to avoid the burdens of administering fractional apportionment mechanisms, the overwhelming majority of states meet the "internal consistency" test by providing a credit for sales or use taxes paid to other states. *See* Walter Hellerstein, *Is "Internal Consistency" Foolish?: Reflections On An Emerging Commerce Clause Restraint On State Taxation,* 87 Mich. L.Rev. 138, 160 (1988); *see also Barringer v. Griffes,* 1 F.3d 1331, 1336 (2d Cir.1993) (observing that "where the Supreme Court examines compensating use taxes under the internal consistency test, such taxes have been upheld as fairly apportioned when they provided for a credit, but have been rejected where no credit was allowed for taxes paid to other states"). However, the crediting structure must be designed properly. Internal consistency requires that states impose identical taxes when viewed in the aggregate——as a collection of state and sub-state taxing jurisdictions. In other words, the interstate taxpayer should never pay more sales or use tax than the intrastate taxpayer.[6]

 The City and County of Denver's municipal code offers tax credits for sales and use taxes imposed by other municipalities, *see* D.R.M.C. § 53–92(c), and the Colorado sales and use tax affords a similar credit for sales and use taxes imposed by other states. *See* § 39–26–203(1)(k), 11 C.R.S. (1999). Denver argues that the establishment of identical tax crediting schemes throughout the country would not lead to the assessment of an unconstitutional tax burden on interstate taxpayers. We disagree, and find Denver's taxing structure to be internally inconsistent because Denver's credit mechanism could cause multiple taxation even if every state and municipality were to impose a taxing scheme similar to the one present in Colorado and Denver.[7]

---

**6.** Denver need not credit sales and use taxes paid for uses in other states after departure of the automobiles from Colorado. *See* D.R.M.C. § 53–92(c).

**7.** A statute may violate the "internal consistency" doctrine if the tax subjects a multi-state taxpayer to the risk of multiple taxation. *See American Trucking Ass'ns, Inc. v. Scheiner,* 483 U.S. 266,

For example, if Colorado imposed a 1% sales or use tax and Denver a 2% tax, a purchaser or user would owe a 3% total tax. Similarly, if Michigan collected a 2% sales or use tax and Detroit a 1% tax, a purchaser or user in Detroit would pay a 3% total tax. However, a user who purchased the item in Detroit would be subject to an additional 1% tax upon the storage or use of the item in Denver because section 53–92(c) only credits taxes paid to other municipalities. Thus, Denver's use tax could burden interstate commerce if every other state and municipality employed the same tax structure as Colorado and Denver, but imposed different tax rates.[8]

▇ Although when viewed in isolation section 53–92(c) provides an internally inconsistent crediting scheme, D.R.M.C. 53–97(11) operates to save it from such a constitutional failure.[9] "There shall be exempt from taxation under the provisions of this article ... (11)[a]ll sales which the city is prohibited from taxing under the Constitution or laws of the United States or the Constitution of the state." D.R.M.C. 53–97(11). It appears to us that Denver created this provision to prevent the courts from invalidating the use tax in its entirety upon a constitutional challenge. While not artfully drafted, the intent is clear.

▇ This court attempts to construe tax ordinances so that they are valid. *See Hiatt v. City of Manitou Springs*, 154 Colo. 525, 529, 392 P.2d 282, 284 (1964). In reviewing the interplay of the same Denver municipal code provisions, the court of appeals stated that "a taxpayer may seek an exemption

from the use tax if Denver fails to give full credit for taxes paid in other taxing jurisdictions, including states, counties, and municipalities." *United Air Lines, Inc. v. City and County of Denver*, 973 P.2d 647, 654 (Colo. App.1998), *cert. denied as improvidently granted*, No. 98SC485 (Colo. Dec. 6, 1999).[10] We agree with the court of appeals' analysis.

On its face, D.R.M.C. § 53–97(11)'s language exempts "[a]ll sales." The use tax portion of the code uses "purchases" and "sales" interchangeably. *See* D.R.M.C. § 53–95(21) (1993) (defining *"[s]ale or purchase or sale and purchase."*). Consequently, section 53–97(11) exempts all constitutionally protected sales and *purchases.* Although Denver seeks to tax GM's use of the automobiles in Denver, not their sale or purchase, Denver bases the amount of tax on the purchase price paid. This tax determination, and the placement of the exemptions within the use tax portion of its code convince us that Denver intended this exemption to apply to its use tax.

▇ We understand that the use of "exemption" in this context could lead to the conclusion that GM owes no tax. However, courts must construe tax exemptions narrowly, and in favor of the taxing authority. *See Security Life & Accident Co. v. Heckers*, 177 Colo. 455, 458, 495 P.2d 225, 226–27 (1972); *Regional Transp. Dist. v. Charnes*, 660 P.2d 24, 25 (Colo.App.1982). Thus, we interpret "exemption" only to reduce the tax owed Denver by the amount of sales and use tax paid to other state and sub-state taxing jurisdictions.[11]

---

284–85, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987); 1 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 4.06[1][a] (1993) [hereinafter 1 Hellerstein & Hellerstein].

8. We recognize that United States case law does not require that states and municipalities examine the laws of all other states when establishing taxes. We provide this example to demonstrate that Denver's use tax scheme permits multiple taxation.

9. GM argues that D.R.M.C. § 53–97(11) should exempt it from all tax because of the unconstitutional crediting scheme. We find this interpretation to be incorrect. Denver may lawfully tax GM's use of the automobiles in Denver, but it must tax GM in a constitutional manner.

10. We granted certiorari in *United* on March 29, 1999 contemporaneously with our receipt of the briefs in this case. After a closer investigation of the issues presented, we determine that we improvidently granted certiorari in *United* and accordingly now dismiss it.

11. Our conclusion leaves open the question of whether the Code fails to alert taxpayers of the proper credit available to them. It could be subject to a due process challenge because a law is void for vagueness when a person of ordinary intelligence cannot reasonably determine what a statute requires or forbids. *See People v. Nissen*, 650 P.2d 547, 550 (Colo.1982); *Missourians for Tax Justice Educ. Project v. Holden*, 959 S.W.2d 100, 105 (Mo.1997). This requirement allows people to conduct themselves in accordance with

■ Our interpretation of D.R.M.C. § 53–97(11) saves Denver's use tax from constitutional invalidity. However, Denver must provide GM with a credit for the sales and use taxes paid to other states and their subdivisions such that GM will pay no more tax on the automobiles than it would have paid by purchasing the component parts in the City and County of Denver, State of Colorado.

### C.

■ We turn then to a consideration of whether the use tax comports with the requirements of external consistency. In contrast to internal consistency, external consistency "looks not to the logical consequences of cloning, but to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). In other words, the state may only impose a tax on interstate activity that "reasonably reflects the in-state component of the activity being taxed." *Goldberg v. Sweet*, 488 U.S. 252, 262, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).

■ Evaluation of external consistency requires an examination of "the in-state business activity which triggers the taxable event and the practical or economic effect of the tax on that interstate activity." *Id.* at 262, 109 S.Ct. 582. If there is a threat of "real multiple taxation," the state may be engaging in "impermissible overreaching." *Jefferson Lines*, 514 U.S. at 185, 115 S.Ct. 1331. No internally consistent sales tax has failed the external consistency test for lack of further apportionment. *See id.* at 192, 115 S.Ct. 1331.

■ In the context of income taxes or taxes on gross receipts, apportionment *must* take into account the location where revenue is generated. *See id.* at 186–90, 115 S.Ct. 1331. Similar apportionment of sales and use taxes would present substantial administration and collection difficulties. *See, e.g., KSS Transp. Corp. v. Baldwin*, 9 N.J.Tax 273, 284 (1987) ("Due to the nature of the sales and use tax, it is impractical to apportion this tax."); 2 Hellerstein & Hellerstein ¶ 18.04[1]. In a likely effort to avoid the foreseeable administration and collection difficulties of such a system, forty-four of forty-five states that impose sales and use taxes employ crediting mechanisms to prevent multiple taxation on sales and use taxes. *See* 2 Hellerstein & Hellerstein ¶ 18.08[1]; *American Bar Association Section on Taxation Sales and Use Tax Deskbook*, 1998–99 Edition (1998). As the Supreme Court has noted:

"These credit provisions create a national system under which the first state of purchase or use imposes the tax. Thereafter, no other state taxes the transaction unless there has been no prior tax imposed ... or if the tax rate of the prior taxing state is less, in which case the subsequent taxing state imposes a tax measured only by the differential rate."

*Jefferson Lines*, 514 U.S. at 194, 115 S.Ct. 1331 (quoting *KSS Transp. Corp.*, 9 N.J.Tax at 285). Without exception, and as GM's state taxation expert testified in the administrative hearing below, the Supreme Court has "commented favorably" [12] on the States'

law, and prevents arbitrary and discriminatory application of the law. *See Nissen*, 650 P.2d at 550; *Missourians*, 959 S.W.2d at 105.

Here, GM does not complain of insufficient notice. Provided that Denver grants the credits demanded by the Constitution to any use taxpayer, the notice issue may never arise.

**12.** 2 Hellerstein & Hellerstein ¶ 18.04(1). Walter Hellerstein, who co-authored this two-volume treatise with his father, is a prominent commentator on state taxation law and was an expert witness for General Motors in this case. The

Hellersteins' work contains the following hypothetical railroad examples:

[R]ailroad cars and other equipment passing through a State, whether or not there is loading or unloading in the State, should, at least theoretically, be subject to use tax within the States if the tax is fairly apportioned, although as stated below, apportionment is not a viable, practical solution to such a tax.

By the same token, a railroad transporting passenger cars through a State would appear to be subject to a properly apportioned use tax, even though no stops are made in the State to

use of crediting mechanisms as a means of avoiding multiple taxation problems. *See, e.g., Goldberg,* 488 U.S. at 264, 109 S.Ct. 582 (holding that a tax on interstate telephone calls does not violate the external consistency requirement because "[t]o the extent that other States' telecommunications taxes pose a risk of multiple taxation, the credit provision contained in the Tax Act operates to avoid actual multiple taxation."); *D.H. Holmes Co. v. McNamara,* 486 U.S. 24, 31, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988) ("We have no doubt that the second ... element[ ] of [*Complete Auto* is] satisfied. The Louisiana taxing scheme is fairly apportioned, for it provides a credit against its use tax for sales taxes that have been paid in other States."); *Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue,* 483 U.S. 232, 245 n. 13, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) ("Many States provide tax credits that alleviate or eliminate the potential multiple taxation that results when two or more sovereigns have jurisdiction to tax parts of the same chain of commercial events.").[13]

■ Contrary to GM's arguments here, the external consistency requirement does not require that sales and use taxes be apportioned based on the length of time tangible property remains in the taxing jurisdiction. For instance, in *Director of Revenue v. Superior Aircraft Leasing Co.,* 734 S.W.2d 504 (Mo.1987), the Missouri Supreme Court upheld the imposition of a Missouri use tax on an aircraft that was leased to an Ohio company and hangared and maintained in Ohio. *See id.* at 507–08. The Missouri court noted that the plane spent 17.7% of its total flight hours in Missouri, and stayed there for periods ranging from two to nine days. *See id.; see also United Air Lines, Inc. v. Mahin,* 410 U.S. 623, 93 S.Ct. 1186, 35 L.Ed.2d 545 (1973) (upholding Illinois' imposition of a use tax on the full value of fuel stored in Illinois for two to twelve days prior to its loading onto commercial aircraft).

Similarly, the Vermont Supreme Court in *Whitcomb Constr. Corp. v. Commissioner of Taxes,* 144 Vt. 466, 479 A.2d 164 (1984) upheld Vermont's imposition of a use tax on the full value of a New Hampshire-owned aircraft that spent 17% of its flight time in Vermont. *Id.* at 165. The Vermont Supreme Court overruled a trial court's decision that had apportioned the taxpayer's liability based on the amount of time the aircraft spent in Vermont:

> The Commerce Clause does not require apportionment in addition to a tax credit. The rule of *Complete Auto* ... requiring a tax on interstate commerce to be "fairly apportioned" is satisfied here. The state has provided a tax credit in lieu of apportionment. This credit, not unlike a proportionate tax, eliminates the possibility of cumulative use tax liability. The Vermont legislature has chosen not to incorporate apportionment within the use tax scheme. This Court, therefore, is without power to impose such a requirement. We agree with the Commissioner that apportionment of this tax is neither constitutionally required nor legislatively authorized.

*Id.* at 168 (citation omitted). This principle reflects the notion that use taxes actually compensate for a sale that took place in another jurisdiction. Hence, it is irrelevant for purposes of a use tax, just as it is irrelevant for purposes of a sales tax, how long the property remains in the taxing jurisdiction. *See Jefferson Lines,* 514 U.S. at 186, 115 S.Ct. 1331.

■ Thus, use taxes are externally consistent if the contested tax contains a credit that operates to eliminate multiple taxation. This rule holds true regardless of how long

---

receive or discharge passengers. However, sales and use taxes do not readily lend themselves to apportionment among the States. Instead, the States allow credits against their use taxes for sales or use taxes imposed by other States. The Supreme Court has commented favorably on the allowance of such credits as a way of eliminating multiple sales-use taxation of interstate commerce.

2 Hellerstein & Hellerstein ¶ 18.04[1] (footnotes omitted).

13. The Court has also endorsed apportionment formulas based on the number of miles a bus, train, or truck has traveled within a taxing jurisdiction. *See Goldberg,* 488 U.S. at 264, 109 S.Ct. 582. However, the Court has noted that these cases "all dealt with the movement of large physical objects over identifiable routes, where it was practicable to keep track of the distance actually traveled within the taxing State." *Id.*

the property remains in the taxing jurisdiction. If the use tax in question contains an effective credit, it is externally consistent. Like the Vermont Supreme Court, we decline to impose an apportionment requirement where the responsible legislative body has chosen not to enact one.

### D.

For purposes of our de novo review, we apply the third and fourth prongs of the *Complete Auto* test, which the parties did not vigorously contest before the Manager of Revenue and upon which the district court did not rule. We find that Denver's tax comports with both requirements because D.R.M.C. § 53–97(11) prevents any discrimination, and the tax bears a substantial nexus to the services provided by Denver to GM.

Under the third prong of *Complete Auto*, we hold that Denver's use tax does not discriminate against interstate commerce. *See Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). A state may not allocate tax burdens between insiders and outsiders in a facially discriminatory manner. *See American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 281, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987). Denver's use tax equally applies to state residents and "outsiders." *See* D.R.M.C. § 53–96. By providing a credit for all sales and use taxes paid to other states, Denver's use tax does not discriminate against interstate commerce.

Under the fourth and final prong of *Complete Auto*, Denver's use tax must be "fairly related to the services provided by the State." *Complete Auto*, 430 U.S. at 279, 97 S.Ct. 1076. "The purpose of this test is to ensure that a State's tax burden is not placed upon persons who do not benefit from services provided by the State." *Goldberg*, 488 U.S. at 266–67, 109 S.Ct. 582. The taxpayer enjoys a "wide range" of benefits from the state including "police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society." *Id.* at 267, 109 S.Ct. 582. However, the imposed tax "need not be limited to the costs of the services incurred by the State on account of [the taxed] activity." *Id.* "'[T]he simple but controlling question is whether the state has given anything for which it can ask return.'" *Colonial Pipeline Co. v. Traigle*, 421 U.S. 100, 109, 95 S.Ct. 1538, 44 L.Ed.2d 1 (1975) (quoting *General Motors Corp. v. Washington*, 377 U.S. 436, 441, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964), *overruled on other grounds by Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue*, 483 U.S. 232, 242, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987)).

Here, GM's use of automobiles at its Denver Lab and on the streets of Denver was afforded all of the benefits that Denver provides to its other citizens—including fire and police protection, social services, utilities, road construction and maintenance, and all the "other advantages of civilized society." *Goldberg*, 488 U.S. at 267, 109 S.Ct. 582. Thus, we find that Denver's decision to impose a use tax, amounting to a one-time cost of approximately $300 per vehicle that GM brought to Denver, was fairly related to the services provided by Denver.

In sum, we find that Denver's assessment of its use tax on the vehicles that GM brought into Denver violates the dormant Commerce Clause under the test that the Supreme Court set forth in *Complete Auto* because it could result in the imposition of a greater tax on an out-of-state taxpayer than on an in-state taxpayer for the same product under certain circumstances. However, we interpret D.R.M.C. § 53–97(11) as saving Denver's use tax from that flaw by requiring that Denver collect only such tax as constitutionally permissible. Accordingly, provided that Denver affords GM the credits to which it is entitled, we hold that Denver's use tax survives constitutional scrutiny.

### IV.

We now consider whether GM qualifies for either of two statutory exemptions to Denver's use tax that GM contends are applicable to its use of automobiles within Denver. *See* D.R.M.C. § 53–97(9) (temporary personal use exemption); D.R.M.C. § 53–97(12) (registered vehicle exemption).

"[T]here is a strong presumption in Colorado against tax exemption." *Mesa Verde Co. v. Board of County Comm'rs,* 178 Colo. 49, 57, 495 P.2d 229, 233–34 (1972); *see also Hagood v. Heckers,* 182 Colo. 337, 348, 513 P.2d 208, 214 (1973). Thus, the "burden is on the taxpayer who claims an exemption to clearly establish the right to such exemption," *Security Life & Accident Co. v. Heckers,* 177 Colo. 455, 458, 495 P.2d 225, 226 (1972), and the "exemption will be strictly construed in favor of the taxing authority." *Regional Transp. Dist. v. Charnes,* 660 P.2d 24, 25 (Colo.App.1982); *see also* D.R.M.C. § 53–117(e) (1993) (placing the burden of proving that an exemption should apply to a given tax assessment on the taxpayer).

### A.

The district court held that GM was entitled to an exemption under the temporary personal use exemption of D.R.M.C. § 53–97(9), which states:

> There shall be exempt from taxation under the provisions of this article the following:
>
> . . .
>
> (9) Sales [14] of tangible personal property purchased outside the city for use, storage, distribution or consumption outside the city by a nonresident of the city while the property is temporarily within the city for the purchaser's own personal use, storage or consumption.

*Id.* (footnote added). GM contends, and the district court agreed, that this exemption includes businesses that use property temporarily within Denver for internal business purposes, where there is no immediate financial gain to the business from the use.

In response, Denver first argued to the trial court that this exemption does not apply because GM *resides* in Denver and does not qualify as a "nonresident." It further argues here that the internal use of property by a business is a commercial or business use regardless of whether there is immediate financial gain from the use, and that the district court should have deferred to the Manager of Revenue's administrative interpretation of the exemption to this effect. In support of its contentions, the city indicates that the purpose of the exemption was to encourage people to travel to Denver without fear of being taxed during temporary visits, and to exempt personal uses of goods that would be difficult to track. We conclude that Denver has the better of these arguments.[15]

The use of "nonresident" in section 53–97 raises the question of whether GM meets the requirements of the exemption. If "nonresident" includes companies, we must then decide which ones are subject to taxation.[16]

In the context of a use tax, we find it significant that Denver elected to use "nonresident" rather than "nonresident person" or "nonresident individual." Because Denver failed to include modifying terms, it must have intended the term to include some businesses. Colorado case law buttresses this conclusion. In *Rocky Mountain Prestress, Inc. v. Johnson,* a use tax case, this court interpreted the clause, "for his own use," contained in a previous version of section 53–97(9). 194 Colo. 560, 565, 574 P.2d 88, 91–92 (1978). Had Denver interpreted "nonresident" to apply only to natural persons, *Rocky*

---

**14.** The plain meaning of "sales" in this exemption suggests that it does not exempt "uses" of tangible personal property. However, an almost identical section appears in the sales tax portion of the D.R.M.C. *See* D.R.M.C. § 53–26 (1993). The location of § 53–97—within the use tax article—and the presence of a similar list of exemptions in the sales tax article convince us that the exemptions contained in § 53–97 apply to the "taxable privilege of storing, using, distributing or consuming . . . tangible personal property." D.R.M.C. § 53–96.

**15.** This construction of D.R.M.C. § 53–97(9) thereby comports with the longstanding interpretation of the Manager of Revenue and affords

due deference to that interpretation. *See City and County of Denver v. Industrial Comm'n,* 690 P.2d 199, 203 (Colo.1984) (noting that this court gives deference to the construction of a statute by administrative officials charged with its enforcement); *Schlagel v. Hoelsken,* 162 Colo. 142, 147, 425 P.2d 39, 42 (1967) ("[I]n interpreting [a] statute we must look to the long-continuing contemporaneous construction of the act by the . . . public officials charged with its administration.").

**16.** Some states specifically define the term "nonresident" so to avoid any confusion. *See* N.J.Rev.Stat. § 54:32B–11(2). The D.R.M.C. does not offer such guidance.

*Mountain Prestress* would not have turned on the phrase, "for his own use," because the exemption would have be inapplicable to companies. As a result, companies may be "nonresidents" for purposes of the use tax.

 Many courts indicate that a corporation is a resident only of the state where incorporated. *See International Serv. Ins. Co. v. Ross,* 169 Colo. 451, 457 P.2d 917 (1969) (applying the above rule in denying a motion for change of venue, but placing some weight on the out-of-state location of the company's home office); *New York Life Ins. Co. v. Pike,* 51 Colo. 238, 117 P. 899 (1911); 36 Am.Jur.2d *Foreign Corporations* § 37 (1968). The Supreme Court of Rhode Island addressed a similar use of "nonresident" in *Great Lakes Dredge & Dock Co. v. Norberg,* 117 R.I. 600, 369 A.2d 1101 (1977). The Rhode Island use tax exemption exempted " '[p]roperty purchased by the user while a *non-resident* of [Rhode Island], and brought into the state by him for his own use.' " *See id.* at 1105 (quoting R.I. Gen. Laws § 44–18–36 (1970)) (emphasis added). Stating that the definition of "residence" for purposes of service of process, venue, or federal diversity is not applicable to the use tax context, the Rhode Island court interpreted "nonresident" to "imply an absence of significant contacts and a lack of consistent operation in th[e] state." *Great Lakes,* 369 A.2d at 1107 (finding that a corporation qualified to do business in Rhode Island which conducted business there for several years was not within the intended meaning of the term "nonresident" as used in the exemption). We agree with that definition of "nonresident."

" '[R]esident' has many meanings in law, largely determined by the statutory context in which it is used." *Black's Law Dictionary* 1309 (6th ed.1990). States developed use taxes to protect state sales tax revenues, and to protect local merchants from loss of business to other states. *See* 2 Hellerstein & Hellerstein ¶ 16.01.

 If "nonresident" is literally construed to refer only to companies incorporated here, the result is absurd. Only those companies incorporated in Colorado [17] would be precluded from utilizing the exemption regardless of their actual operating locales. On the other hand, all other businesses would meet the nonresident requirement regardless of the extent of their Denver business operations. Such a result makes little sense. Denver surely intended to tax those businesses that have substantial activity in the city. The law must be tied to some degree of Denver activity, and the place of incorporation seems to be of little significance. As the Denver code employs the term "nonresident" in section 53–97(9), GM's Denver operations clearly fail the nonresidency requirement. Therefore, GM does not qualify for the exemption.

Although the above examination eliminates GM's ability to seek refuge in section 53–97(9), we further address and clarify our previous interpretation of "personal use." We considered the definition of personal use in *Rocky Mountain Prestress, Inc. v. Johnson,* 194 Colo. 560, 574 P.2d 88 (1978). In that case, Rocky Mountain Prestress (RMP), a construction company, brought mobile cranes into Denver for its own use in the construction of buildings. *See id.* at 564, 574 P.2d at 91. Denver attempted to impose its use tax upon the value of the crane services, and RMP argued that it was exempt under the temporary use exemption.[18] *See id.* at 564–65, 574 P.2d at 91. We held that Denver could not tax the value of the crane services under the use tax, but rather could tax only the retail value of the cranes. *See id.* at 565, 574 P.2d at 92. More importantly for purposes of this case, we held that the temporary use exemption was inapplicable to the facts of that case:

> Denver added the term later—presumably to conform with our interpretation. The amendment supports the interpretation of the Manager of Revenue that "personal use" excludes "business uses."

---

17. Companies incorporate in states, not cities or counties, further demonstrating that "nonresident" must apply to something other than domicile.

18. When we decided *Rocky Mountain Prestress,* D.R.M.C. § 53–97(9) did not include "personal."

When the purposes to be accomplished by the enactment of a use tax are considered, it is clear that "for his own use" must be construed to mean "for his personal use." If this were not the case, the exemption would frustrate an essential purpose of the use tax, the recoupment of lost sales tax revenue. Since the use of the cranes in fulfillment of a construction contract cannot be considered to be a personal use, the use tax applies.

*Id.* at 565, 574 P.2d at 91–92. Hence, a business may not claim the personal use exemption if the use furthers the fulfillment of a business purpose.

 We conclude that the nature of the use, rather than length of use, is dispositive on the issue of whether a use is personal. In the context of *Rocky Mountain Prestress,* the fact that the taxpayer used its property directly in a construction contract supported the notion that its use was for business purposes, not personal use. Here, GM used over one-thousand automobiles per year in an enterprise that was clearly commercial: to develop new automobile models that GM could sell to future customers. Accordingly, we hold that GM was not entitled to the exemption contained in D.R.M.C. § 53–97(9) because it was not a nonresident and its use was not personal.

### B.

 The second exemption that GM contends is applicable to its use of the automobiles in Denver is the registered vehicle exemption in D.R.M.C. § 53–97(12). That exemption excludes from taxation "[s]ales of automotive vehicles [19] as defined in this article that are registered and required by state law to be registered outside the city." *Id.*

The code defines "sales", in part, as follows:

> *Sale* ... includes installment and credit purchases and sales and *the exchange of property or services that are taxable under the terms of this article* as well as the purchase and sale thereof for money; and every transaction conditional or otherwise, based upon consideration constitutes a sale.

D.R.M.C. § 53–95(21) (emphasis added).

GM contends that this court should impute a sale of vehicles to have occurred when GM removed the vehicles from its inventory and used them for its own purposes, and that it should therefore fall within the "sale of automotive vehicle" language of the D.R.M.C. § 53–97(12) exemption. Such an approach, however, would be inconsistent with our holding in *International Business Machines Corp. v. Charnes,* 198 Colo. 374, 601 P.2d 622 (1979). In that case, we held that a previously applicable use tax exemption for wholesale purchases of parts and materials was no longer available when the company removed the items from inventory for its own use. *See id.* at 378–79, 601 P.2d at 625. Thus, we did not "impute" a subsequent sale of parts and materials, but simply recharacterized the original sale.

As such, the relevant sale for purposes of use tax analysis is GM's original purchase of parts and materials—a transaction that is not a "sale[ ] of [an] automotive vehicle[ ]." § 53–97(12); *see also Rocky Mountain Prestress,* 194 Colo. at 563–64, 574 P.2d at 90–91 (discussing when a "fictional purchase at retail" might be appropriate for purposes of the Denver use tax).

The Manager of Revenue ruled that GM was not entitled to this exemption, because: (1) the assessment at issue in this case was not for GM's purchase of automotive vehicles, but rather was for its purchase of parts and materials; and (2) GM failed to introduce evidence establishing that another jurisdiction required GM's vehicles to be registered outside of Denver. The district court affirmed this ruling, holding that:

> The Denver tax is imposed on the component parts of the vehicles, not the value

---

19. The code defines automotive vehicle as:
 any vehicle or device in, upon or by which any person or property is or may be transported or drawn upon a public highway, or any device used or designed for aviation or flight in the air. Automotive vehicle includes, but is not limited to, motor vehicles, trailers, semi-trailers or mobile homes. Automotive vehicle shall not include devices moved by human power. D.R.M.C. § 53–95(1) (1993).

of the vehicle. This is not simply form over substance. The value of the "vehicles," after all parts and labor are combined, is much higher than the component parts before the vehicle is assembled.

The exemption is not applicable to the present situation.

Given the strong presumption against the application of exemptions and the fact that the burden of proof rests on the taxpayer to establish its right to an exemption—a burden that GM failed to carry here—we conclude that the Manager of Revenue and the district court correctly denied GM the benefit of the D.R.M.C. § 53–97(12) exemption.

## V.

We conclude that Denver's assessment of its use tax upon GM was both constitutional and authorized by ordinance if Denver applies the appropriate sales and use tax credit to its tax assessment. We turn then to GM's final contention: that the Manager of Revenue should have waived GM's 10% late payment penalty because GM reasonably and in good faith believed that the vehicles at issue were not subject to the City's use tax. In support of this position, GM cites the court of appeals' recent decision in *United Air Lines*, 973 P.2d at 655 ("If the hearing officer determined that the imposition of penalties was mandatory, she erred in not considering whether the airlines have shown good cause to warrant waiver of such penalties."). The Manager of Revenue upheld the penalty, and the district court did not address the issue.

D.R.M.C. § 53–114(a) authorizes the Manager of Revenue to impose a 10% penalty on taxpayers who fail to report and pay their tax liabilities in a timely fashion. That provision states: "In any case in which a taxpayer fails to file a return or pay over the tax within the time required by this article, but without the intent to defraud, there shall be added as a penalty ten (10) percent of the total amount of the deficiency . . . ." § 53–114(a). The ordinance clearly contemplates that a penalty may be assessed even in cases where the taxpayer has no intent to defraud. *See id.; see also Western Elec. Co. v. Weed*, 185 Colo. 340, 355, 524 P.2d 1369, 1376–77 (1974) (determining the application of a simi-

lar tax penalty provision. "Appellants argue that the statute was not intended to . . . penalize a taxpayer who has a good faith dispute on a legal question. The statute, however, in plain and clear language, imposes the penalty upon an intentional but non-fraudulent avoidance of the tax."). Perhaps to mitigate the potentially harsh effect of this section, D.R.M.C. § 53–133 (1993) authorizes the Manager of Revenue to waive the tax penalty "for good cause shown." *See id.* Here, the circumstances become even more complex because we have concluded that Denver's past interpretation of the credit mechanism was unconstitutional.

The district court failed to reach the penalty issue because it found Denver's use tax wholly unconstitutional. Ordinarily the district court first evaluates the imposition of a penalty by the Manager of Revenue. In light of our decision here, we remand the case to the district court for its findings and conclusions on the penalty issue.

## VI.

We affirm the district court's ruling that GM was not entitled to the D.R.M.C. § 53–97(12) registered vehicle exemption, but reverse the district court's holding concerning the constitutionality of Denver's use tax assessment and the applicability of the D.R.M.C. § 53–97(9) temporary personal use exemption. We remand this case to the district court for determination of the appropriate credit in accordance with the principles we set forth today and for a decision concerning imposition of any penalty.

Justice SCOTT does not participate.