[J-5A-B-2023]

**IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| DIANE ZILKA, | : | No. 20 EAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court entered on |
| | : | January 7, 2022, at No. 1063 CD |
| v. | : | 2019 affirming the Order entered on |
| | : | June 26, 2019, in the Court of |
| | : | Common Pleas, Philadelphia |
| TAX REVIEW BOARD CITY OF | : | County, Civil Division at Nos. 02438 |
| PHILADELPHIA, | : | and 02439, October Term 2018. |
| | : | |
| Appellee | : | ARGUED: March 7, 2023 |
| DIANE ZILKA, | : | No. 21 EAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court entered on |
| | : | January 7, 2022, at No. 1064 CD |
| v. | : | 2019 affirming the Order entered on |
| | : | June 26, 2019, in the Court of |
| | : | Common Pleas, Philadelphia |
| TAX REVIEW BOARD CITY OF | : | County, Civil Division at Nos. 02438 |
| PHILADELPHIA, | : | and 02439, October Term 2018. |
| | : | |
| Appellee | : | ARGUED: March 7, 2023 |

**OPINION**

**CHIEF JUSTICE TODD**                                    **DECIDED: NOVEMBER 22, 2023**

In this appeal by allowance, we consider whether the City of Philadelphia (the "City" or "Philadelphia") unconstitutionally discriminated against interstate commerce by subjecting a Philadelphia resident who worked exclusively out of state to its wage tax (the "Philadelphia Tax"), and allowing her credit against that tax only for the local income tax

she paid to another jurisdiction, while declining to afford her additional credit for the out-of-state income tax she paid. In conjunction with this overarching issue, we must determine whether, for purposes of the dormant Commerce Clause analysis implicated herein, state and local taxes must be considered in the aggregate. For the reasons that follow, we conclude that state and local taxes need not be aggregated in conducting a dormant Commerce Clause analysis, and that, ultimately, the City's tax scheme does not discriminate against interstate commerce. Accordingly, we affirm the order of the Commonwealth Court.

## I. Introduction: The Commerce Clause

By way of background, the Commerce Clause provides that "Congress shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const. art. 1, § 8, cl. 3 (first ellipses original). While the Commerce Clause is an express grant of power to Congress, the United States Supreme Court has consistently held that the language also contains a "negative command, known as the dormant Commerce Clause," which prohibits "certain state taxation even when Congress has failed to legislate on the subject." *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). Notably, the high Court has explained that the crux of the dormant Commerce Clause is that a state "may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State," *id.* (quoting *Armco Inc. v. Hardesty*, 467 U.S. 638, 642 (1984)), nor may it "impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage to local business, or by subjecting interstate commerce to the burden of 'multiple taxation,'" *id.* at 549-50 (quoting *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959)). However, where alleged taxation disparities stem from the combined effect of two otherwise lawful income tax schemes,

the Court has manifestly determined that there is no discrimination against interstate commerce. *See Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978) (observing that "[t]he prevention of duplicative taxation[] . . . would require national uniform rules for the division of income," which is a task solely in the province of Congress).

Significantly, in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977), the high Court crafted a four-part test for determining whether a state or local tax unconstitutionally burdens interstate commerce. Under this test, a tax does not violate the dormant Commerce Clause if it: (1) is applied to an activity with a substantial nexus to the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the state.[1] *Id.* at 279. Relevant to the instant appeal, to determine whether a tax is fairly apportioned, a court must assess whether the tax is internally and externally consistent. The high Court has explained that internal consistency is met "when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear." *Jefferson Lines*, 514 U.S. at 185. Conversely, an internally inconsistent tax demonstrates that a state "is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax." *Id.* (citation omitted). As for external consistency, a court must examine "the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Id.* (citation omitted).

---

[1] Presently, Appellant contends that the Philadelphia Tax violates the fair apportionment and discrimination prongs of the *Complete Auto* test.

Relevant to the instant appeal, in 2015, the high Court grappled with these issues in *Wynne*, *supra*. Therein, the Court examined Maryland's tax scheme, under which Maryland required its residents to pay a "state" income tax which was set at a graduated rate, and a "county" income tax, the rate of which varied by county for wages earned both in and out of state, and additionally imposed upon nonresidents a "special nonresident" tax on their income earned in Maryland. *Wynne*, 575 U.S. at 545-46. While Maryland allowed residents who earned income out of state a credit against the state tax, it did not permit them any credit against the county tax. *Id.* at 546. Critically, the high Court determined that, "[d]espite the names that Maryland ha[d] assigned to these taxes, both [were] State taxes," noting that "both [were] collected by the State's Comptroller of the Treasury." *Id.* (citation omitted).

Turning to *Complete Auto*, the *Wynne* Court observed that the internal consistency test "allows courts to isolate the effect of a defendant State's tax scheme" by "hypothetically assuming that every State has the same tax structure." *Wynne*, 575 U.S. at 562. In this vein, the Court explained that the internal consistency test permits courts to distinguish between "tax schemes that inherently discriminate against interstate commerce without regard to the tax policies of other States," and "tax schemes that create disparate incentives to engage in interstate commerce (and sometimes result in double taxation) only as a result of the interaction of two different but nondiscriminatory and internally consistent schemes," emphasizing that the former category of taxes are generally unconstitutional, while the latter are not. *Id.* (citing, *inter alia*, *Armco Inc.*, 467 U.S. at 645-46; *Moorman Mfg. Co.*, 437 U.S. at 277 n.12).

Ultimately, bearing in mind these principles, the Court found that Maryland's county tax was unconstitutional because Maryland failed to permit residents a credit for similar taxes paid to out-of-state jurisdictions, thus resulting in double taxation on a portion of

residents' income. Indeed, applying the internal consistency test to Maryland's tax scheme, the Court assumed that all states adopted the following taxes, consistent with Maryland's county and special nonresident taxes: "(1) a 1.25% tax on income that residents earn in State, (2) a 1.25% tax on income that residents earn in other jurisdictions, and (3) a 1.25% tax on income that nonresidents earn in State."[2] *Id.* at 564-65. The Court observed that, under this scenario, an in-state resident and an out-of-state resident would incur disparate tax obligations:

> Assume . . . that two taxpayers, April and Bob, both live in State A, but that April earns her income in State A whereas Bob earns his income in State B. In this circumstance, Bob will pay more income tax than April solely because he earns income interstate. Specifically, April will have to pay a 1.25% tax only once, to State A. But Bob will have to pay a 1.25% tax twice: once to State A, where he resides, and once to State B, where he earns the income.

*Id.* at 565. Based on this analysis, the Court concluded that Maryland's tax scheme was unconstitutional, as the disparate treatment of interstate commerce emanating therefrom was "not simply the result of [the tax scheme's] interaction with the taxing schemes of other States," but, rather, stemmed from inherent discrimination contained within the scheme. *Id.* (citations omitted).

Aptly, the Court stressed that "Maryland could remedy the infirmity in its tax scheme by offering, as most States do, a credit against income taxes paid to other States," which would vindicate the tax scheme under the internal consistency test. *Id.* at 568 (citation omitted). Illustrating this point, the Court tweaked the above hypothetical scenario to assume that all states impose those same taxes but also allow a credit against income taxes paid by residents to other jurisdictions. Under such circumstances, the

---

[2] The Court appears to have used the 1.25% rate for all three taxes simply for ease of applying the internal consistency test, as the rate is not reflective of the actual rates of Maryland's relevant taxes.

Court noted that "April (who lives and works in State A) and Bob (who lives in State A but works in State B) would pay the same tax," observing that "April would pay a 1.25% tax only once (to State A), and Bob would pay a 1.25% tax only once (to State B, because State A would give him a credit against the tax he paid to State B)." *Id.* However, as Maryland offered no such credit against its county tax, the Court declared the tax scheme unconstitutional.

## II. Factual and Procedural Background

With that backdrop, we now turn to the facts of this appeal. In April 2017 and June 2017, Appellant Diane Zilka filed petitions with the City's Department of Revenue (the "Department"), seeking refunds for the Philadelphia Tax she paid from 2013 to 2015, and in 2016, respectively.[3] During the relevant tax years, Appellant resided in the City, but worked exclusively in Wilmington, Delaware. Thus, she was subject to four income taxes (and tax rates) during that time: the Philadelphia Tax (3.922%); the Pennsylvania Income Tax ("PIT") (3.07%); the Wilmington Earned Income Tax ("Wilmington Tax") (1.25%); and the Delaware Income Tax ("DIT") (5%).[4] The Commonwealth granted Appellant credit for her DIT liability to completely offset the PIT she paid for the tax years 2013 through 2016; because of the respective tax rates in our Commonwealth versus the State of Delaware, after this offsetting, Appellant paid the remaining 1.93% in DIT. Although the City similarly credited against Appellant's Philadelphia Tax liability the amount she paid in the Wilmington Tax — specifically, the City credited Appellant 1.25% against her Philadelphia Tax liability of 3.922%, leaving her with a remainder of 2.672% owed to the City —

---

[3] While Appellant filed two separate refund petitions, for ease of reference, we will simply refer to her request for refunds singularly, as the resolution of each petition hinges upon the same issue.

[4] Herein, we will employ the figures utilized by the Commonwealth Court below, which represent the tax rates of the 2014 tax year.

Appellant claimed that the City was required to afford her an additional credit of 1.93% against the Philadelphia Tax, representing the remainder of the DIT she owed after the Commonwealth credited Appellant for her PIT.

After the City refused to permit her this credit against her Philadelphia Tax liability, Appellant appealed to the City's Tax Review Board (the "Board"). Following two hearings on the matter, the Board denied Appellant's refund request. Appellant then appealed to the trial court, which affirmed the decision of the Board without taking additional evidence.

Thereafter, Appellant appealed to the Commonwealth Court, renewing her claim that she was owed a credit against the Philadelphia Tax for the portion of her DIT liability which was not offset/credited against her PIT. Appellant suggested that the failure to grant her this credit amounted to double taxation in violation of the Commerce Clause. More specifically, Appellant asserted that, because the City failed to offset her Philadelphia Tax with the remainder of her DIT liability, the tax scheme failed the *Complete Auto* test. In that regard, Appellant contended that: (1) the tax is not fairly apportioned, as it lacks a mechanism to mitigate the risk of duplicative taxation for income earned from interstate commerce, thus failing to meet the internal and external consistency tests; and (2) the City's partial credit practice discriminatorily forces her to pay more in taxes than her intrastate counterparts. Notably, in support of her claim, Appellant relied heavily on *Wynne*, *supra*, contending that the high Court's decision requires state and local taxes to be considered as one.

In a unanimous, unpublished memorandum opinion authored by Judge Michael H. Wojcik, the Commonwealth Court affirmed. *Zilka v. Tax Rev. Bd. City of Phila.*, 1063-1064 C.D. 2019 (Pa. Cmwlth. filed Jan. 7, 2022) (*en banc*). In so doing, the court concluded that Appellant was not subject to double taxation in violation of the Commerce Clause, as she never paid more than one local and one state tax at a time. From the

court's perspective, the City taxed Appellant at the same rate (3.922%) as it taxed other residents who worked in Pennsylvania, and she paid 1.93% more in taxes than her intrastate counterparts only because she chose to work in Delaware, which charges a higher income tax than Pennsylvania. Indeed, the court highlighted that the City credited Appellant the full amount of her Wilmington Tax liability to offset the Philadelphia Tax she incurred, while declining to apply tax credit for the balance of the DIT which remained "unused" after offsetting the PIT (namely, 1.93%). The court emphasized that, in its view, the City's decision not to apply the remainder of Appellant's DIT to offset her Philadelphia Tax simply did not amount to double taxation.

Nevertheless, assuming that there was a risk of double taxation, the court analyzed the City's taxation scheme under the *Complete Auto* test. First, focusing on the "fair apportionment" prong of the test, the court determined that the Philadelphia Tax is internally consistent, as "all individuals earning income outside of their home locality would receive a credit for income taxes paid to the foreign locality and would pay no more than their intrastate counterpart" if the wage tax were imposed in every jurisdiction. *Id.* at 8. Likewise, the court found that the Philadelphia Tax meets the external consistency test, explaining that the tax "reasonably reflects how and where [Appellant's] income is generated," and "is not taxing all of [Appellant's] income regardless of source." *Id.* at 9. In that vein, the court opined that the City "fairly apportions the tax according to its relation to the income by providing a credit for the tax owed to Wilmington," such that the City never taxed more than its fair share of Appellant's wages. *Id.* Relatedly, the court reasoned that "Philadelphia's provision of municipal benefits and services to its residents provides sufficient economic justification for the imposition of [the Philadelphia Tax]." *Id.* (citing *Lawrence v. State Tax Comm'n of Miss.*, 286 U.S. 276, 279 (1932) (observing that "domicile in itself establishes a basis for taxation," as "[e]njoyment of the privileges of

residence within the state, and the attendant right to invoke the protection of its laws, are inseparable from the responsibility for sharing the costs of government")).

Next, turning to the "discrimination" prong of the *Complete Auto* test, the court highlighted that the City taxes all of its residents' income at the rate of 3.922% and fully credits any similar taxes a resident paid to another jurisdiction. To that end, the court noted that, here, because Appellant's income was taxed at 1.25% by Wilmington, the City applied 1.25% credit toward her Philadelphia Tax. Thus, the court found that Appellant did not pay double taxes on her income; instead, the court determined, she paid the same 3.922% rate as all of the City's residents, with the only difference being that the City "receiv[ed] only 2.67%, while Wilmington . . . receiv[ed] 1.25%." *Id.* at 10.

Finally, the court found that "*Wynne* does not compel Philadelphia to apply an additional credit for any dissimilar taxes, such as the [DIT]. . . ." *Id.* at 13. From the court's perspective, "[a]lthough the *Wynne* Court held that Maryland was required to offset its so-called 'county' tax against other 'state' taxes, the 'county' tax was actually a state tax because it was administered, adopted, mandated, and collected by the state." *Id.* Conversely, the court emphasized that, here, "both the [Philadelphia Tax] and Wilmington Tax are municipal taxes." *Id.* On that basis, the court opined that Appellant's taxes were appropriately credited in an "apples to apples" manner — with Delaware's state tax offsetting Pennsylvania's state tax and Wilmington's municipal tax offsetting the City's municipal tax. This approach, in the court's view, comported with the high Court's holding in *Wynne*, and, moreover, passed constitutional muster. Thus, reiterating that the taxation of Appellant's income in excess of the taxation of her intrastate cohorts stemmed solely from her decision to work in Delaware, which has a higher rate of taxation than Pennsylvania — and not from the City's tax scheme — the court found that Appellant was not subject to double taxation. Accordingly, the court affirmed the trial court's decision.

Appellant subsequently filed a petition for allowance of appeal with our Court, and we granted review to consider whether the City, in declining to apply the remainder of Appellant's DIT liability to offset her Philadelphia Tax liability, discriminated against interstate commerce in violation of the dormant Commerce Clause.[5] As illuminated by the parties' arguments, this question necessarily requires us to determine whether state and local taxes are indistinguishable when analyzing a challenged tax scheme under the dormant Commerce Clause.

### III. Arguments

Regarding that prefatory issue, Appellant initially contends that state and local income tax burdens must be aggregated in reviewing a dormant Commerce Clause challenge, in essence, maintaining that local or municipal taxes, such as the Philadelphia Tax, are indistinguishable from state taxes because political subdivisions are creatures of the state. According to Appellant, in *Associated Industries of Missouri v. Lohman*, 511

---

[5] The question, as phrased by Appellant, reads:

> [Appellant], a Philadelphia resident who worked in Wilmington, Delaware, was subject to [the PIT, the Philadelphia Tax, the DIT, and the Wilmington Tax]. Pennsylvania allowed [Appellant] to credit [the] DIT paid against her PIT liability. The City . . . allowed [Appellant] to credit [the] Wilmington Tax paid against her [Philadelphia Tax] liability. [The] DIT [which Appellant] paid exceeded the PIT credit she was allowed ("Unapplied Credit"). The City did not allow [Appellant] to apply the Unapplied Credit against the [Philadelphia] Tax. The U.S. Supreme Court held the Commerce Clause of the U.S. Constitution dictates that taxing jurisdictions must grant their residents a credit for state and local income taxes paid to other state and local taxing jurisdictions. [*Wynne*, *supra*]. Did the Commonwealth Court err, as a matter of law, where it held it was constitutional for the City not to apply [Appellant's] Unapplied Credit against her [Philadelphia] Tax liability?

*Zilka v. Tax Rev. Bd. City of Phila.*, 281 A.3d 1029 (Pa. 2022) (order).

U.S. 641 (1994) (holding that Missouri's use tax scheme impermissibly discriminated against interstate commerce in certain localities in which the use tax exceeded the sales tax), the United States Supreme Court endorsed the notion that federal constitutional restraints on state and local taxation of cross-border economic activity must be evaluated in light of the state's tax scheme in its entirety. Appellant asserts that, more recently, in *Wynne*, the high Court made no distinction between state and local taxes, as it determined that, "[i]n applying the dormant Commerce Clause, they must be considered as one." Appellant's Brief at 13 (emphasis omitted) (quoting *Wynne*, 575 U.S. at 564 n.8).

Relatedly, Appellant proffers that appellate courts in West Virginia, Colorado, and Arizona have found that state and local tax schemes must be considered in tandem under the Commerce Clause. Appellant notes that the West Virginia Supreme Court invalidated a tax scheme in which the state failed to grant credit against its state-level use tax for local sales taxes paid out of state. *See Matkovich v. CSX Transp. Inc.*, 793 S.E.2d 888 (W. Va. 2016). Appellant highlights that, in doing so, the *Matkovich* court "evaluated all of the taxes at issue at the state level – regardless of whether they were imposed by a state or locality." Appellant's Brief at 14. Similarly, Appellant posits that, in *General Motors Corp. v. City & County of Denver*, 990 P.2d 59 (Colo. 1999), the Colorado Supreme Court invalidated a Denver tax scheme which did not provide credit for sales and use taxes paid to other states and their subdivisions. Appellant stresses that, in deeming the tax scheme unconstitutional, the *General Motors* court explained: "Internal consistency requires that states impose identical taxes when viewed in the aggregate – as a collection of the state and sub-state taxing jurisdictions. In other words, the interstate taxpayers should never pay more sales or use tax than the intrastate taxpayer." *Id.* at 69. Appellant also suggests that *Arizona Department of Revenue v. Arizona Public Service Co.*, 934 P.2d 796 (Ariz. Ct. App. 1997), supports her position that state and local taxes

must be considered together, as, therein, the Arizona Court of Appeals held that "[t]he derivative relationship between a state and its counties means that when a county imposes a tax, it does so pursuant to a delegation of state tax authority." *Id.* at 799.

Moreover, Appellant submits that our Court's jurisprudence supports her construction of the dormant Commerce Clause and the need to aggregate state and local taxes thereunder. In that regard, Appellant cites to *Philadelphia Eagles Football Club, Inc. v. City of Philadelphia*, 823 A.2d 108 (Pa. 2003) (OAJC) ("*Philadelphia Eagles*"), and, with little additional analysis, claims that, in that case, we required "[a]pportionment of a local tax . . . as a result of the state taxes in the other states to which the [Philadelphia Eagles] [t]eam was subject." Appellant's Brief at 16 (emphasis omitted). Appellant similarly avers that, in *Northwood Construction Co. v. Township of Upper Moreland*, 856 A.2d 789 (Pa. 2004), we "held that the Commerce Clause mandated that the Township of Upper Moreland . . . apportion the taxpayer's receipts derived from its Maryland, Delaware, and New Jersey construction activities," requiring apportionment for "state taxes, not any local tax." Appellant's Brief at 16-17. Additionally, Appellant contends that the Commonwealth Court endorsed an analysis which relates local tax to state tax in *Upper Moreland Township v. 7-Eleven, Inc.*, 160 A.3d 921 (Pa. Cmwlth. 2017), wherein the intermediate court "held that the Commerce Clause mandated that the [t]ownship apportion the taxpayer's receipts derived from its Pennsylvania franchisees because much of the activities supporting the Pennsylvania franchisees were performed in Texas, the company's headquarters, or elsewhere outside of Pennsylvania." Appellant's Brief at 17. According to Appellant, these three cases demonstrate that our Court and the lower court "have consistently recognized that a Commerce Clause analysis *must* examine the local tax as it relates to the state tax." *Id.* at 17 (emphasis original).

Appellant next argues that "Philadelphia is part of Pennsylvania and is subject to the laws and restrictions imposed upon it by Pennsylvania." *Id.* at 19. To that end, Appellant observes that, "unless authorized by state statute, Philadelphia does not have the power to impose any tax." *Id.* (emphasis omitted). Indeed, Appellant asserts that, because the City derives its authority to impose taxes by way of state statute,[6] its "ability to assess and collect any tax, including the [Philadelphia] Tax, is at the absolute behest of Pennsylvania." *Id.* at 20. Thus, Appellant insists that we must examine the state and

---

[6] Appellant notes that the City obtained its right to self-governance via the First Class City Home Rule Act, 53 P.S. § 13101 *et seq.*, which precludes the City from enacting taxes without an express grant of authority from the General Assembly, *see id.* § 13133(a)(8). Appellant further explains that the City procured the right to impose the Philadelphia Tax by way of the Sterling Act, *id.* § 15971, which provides, in relevant part:

> From and after the effective date of this act, the council of any city of the first class shall have the authority by ordinance, for general revenue purposes, to levy, assess and collect, or provide for the levying, assessment and collection of, such taxes on persons, transactions, occupations, privileges, subjects and personal property, within the limits of such city of the first class, as it shall determine, except that such council shall not have authority to levy, assess and collect, or provide for the levying, assessment and collection of, any tax on a privilege, transaction, subject or occupation, or on personal property, which is now or may hereafter become subject to a State tax or license fee.

*Id.* Appellant also highlights that the General Assembly carved out a savings clause in the PIT, expressly permitting the City to impose the Philadelphia Tax:

> Notwithstanding anything contained in any law to the contrary, including but not limited to the provisions of . . . the Sterling Act, the validity of any ordinance or part of any ordinance or any resolution or part of any resolution, and any amendments or supplements thereto now or hereafter enacted or adopted by any political subdivision of this Commonwealth for or relating to the imposition, levy or collection of any tax, shall not be affected or impaired by anything contained in this article. . . .

72 P.S. § 7359(a) (internal footnote omitted).

local tax burdens placed upon her simultaneously to determine whether the City violated the dormant Commerce Clause in imposing upon her the Philadelphia Tax, while declining to afford her credit against that tax for her DIT liability.

Pivoting to the *Complete Auto* test, Appellant avers that the City's tax practice discriminates against interstate commerce, renewing her contention that she has been subject to double taxation, as her tax burden was 1.93% higher than her intrastate counterparts. Appellant argues that the City's "partial-credit practice," as she phrases it, discriminates against interstate commerce by imposing a tax burden on cross-border activity which "exceeds the tax burden that [the City] imposes upon commercial activity that takes place solely within Pennsylvania." *Id.* at 30-31. In Appellant's view, it matters not that she chose to work in Delaware, rather than Pennsylvania, because taxpayers who choose to work in Pennsylvania received a lower tax rate than she did. In this vein, Appellant concludes that "any tax scheme which encourages a taxpayer to conduct intrastate activities instead of interstate activities unconstitutionally burdens interstate commerce." *Id.* at 31 (citations omitted).

With respect to the fair apportionment prong of the *Complete Auto* test, Appellant contends that the City's tax practice fails "because it does not provide a mechanism to mitigate the risk of duplicative taxation for income earned from interstate commerce," thus flouting "the constitutional restriction limiting a [state's] taxing powers." *Id.* at 33 (citation omitted). In this regard, Appellant correctly acknowledges that, under the internal consistency test, we must "assume that every state/local government enacts the same tax regime," and determine "whether such hypothetical harmonization imposes a greater burden upon interstate commerce than is imposed upon intrastate commerce." *Id.* at 36 (citing *Goldberg v. Sweet*, 488 U.S. 252, 261 (1989)). Nevertheless, instead of applying the internal consistency test in this manner — *i.e.*, assuming that all states and local

jurisdictions adopt the same tax rates and tax crediting systems as the Commonwealth and the City — Appellant merely hypothesizes that the taxing jurisdictions adopt the same systems of providing credit, but maintain their own differing tax rates. In so doing, Appellant opines that the City's taxation scheme is internally inconsistent, proclaiming: "if every [s]tate or locality adopted [the City's] tax practice, interstate income would be subjected to multiple taxation nationwide." *Id.* at 38.

Appellant likewise avers that the City's tax scheme is not externally consistent, as the City taxed her income generated in Wilmington, despite the fact that she had conducted no business in Philadelphia. In essence, Appellant asserts that she was taxed merely because she lived in the City, with no legitimate nexus between her economic activity conducted in Wilmington and the City to justify imposition of the Philadelphia Tax. According to Appellant, "[i]t is clear that taxing Appellant's income, where none of it is earned in Philadelphia, is disproportionate to the business (or lack thereof) transacted by Appellant in Philadelphia." *Id.* at 40. Appellant suggests that *Philadelphia Eagles*, *Northwood Construction*, and *7-Eleven* establish that a locality may not impose a tax upon 100% of a taxpayer's activity when such activity did not occur in that locality. While she acknowledges that, here, the City granted a tax credit representing the Wilmington Tax, Appellant contends that the City nonetheless "subject[ed] 69% of [her] income to [the Philadelphia] Tax for work performed entirely outside of the state." *Id.* at 43 (emphasis omitted). Finally, Appellant discounts the Commonwealth Court's conclusion that her residency in the City is reason enough to justify imposition of the Philadelphia Tax, arguing:

> All states and localities, including Philadelphia, can meet the fair apportionment requirement by imposing taxes upon their residents the same way they tax their non-residents – by taxing only income generated in Philadelphia, and allowing other jurisdictions to impose their own taxes upon income generated elsewhere. Alternatively, states and localities can

choose to tax all of their residents' income regardless of where earned, but provide credits for income taxes paid elsewhere. But whichever system is chosen, it must be fair, and it must attempt to allocate the tax based upon where the economic activity occurs, [*i.e.*,] where the income is *generated*. [The City's] practice makes no such effort.

*Id.* at 45-46 (emphasis original). Appellant, thus, concludes that, "[w]hile [the City] may have the jurisdiction to tax all of Appellant's income, that does not mean its ability to do so does not violate the Commerce Clause." *Id.* at 47.[7]

The City counters by first emphasizing that, contrary to Appellant's assertions, our Court has, in the past, distinguished state taxes from local taxes. *See McClelland v. City of Pittsburgh*, 57 A.2d 846, 848 (Pa. 1948) ("State taxes stand on a different basis from local levies; the former are essential to the very 'preservation' of the state itself, while the latter are authorized or permitted by the state, not for its actual preservation, but merely to maintain the machinery of local government." (citation and internal citation omitted)); *Nat'l Biscuit v. City of Phila.*, 98 A.2d 182, 186-87 (Pa. 1953) (finding that a tax administered entirely for the benefit of a municipality was not a state tax, but a local tax);

_____

[7] The American College of Tax Counsel ("ACTC") submitted an *amicus* brief in support of Appellant, agreeing with her position that, by refusing to grant her full credit for her DIT liability, the City is taxing Appellant at a higher rate than it would if she was a Philadelphia resident working entirely in Philadelphia, thus burdening her participation in interstate commerce. In so reasoning, ACTC proffers that, under *Wynne*, the City was required to give Appellant a credit for her excess DIT to offset the Philadelphia Tax, claiming that the Philadelphia Tax is indistinguishable from the "county" tax which was at issue in *Wynne*, given that municipal governments are "nothing more than creatures of the state." ACTC's Brief at 9. Relatedly, ACTC proffers that, because state and local taxes must, in its view, be considered as one, the lower court erred in finding that Appellant was subjected to a higher tax rate simply as a result of her choice to work in Delaware, which has a higher state tax rate. According to ACTC, "it is not Delaware's responsibility to provide a credit, but rather Pennsylvania and Philadelphia, who are imposing a tax upon income earned elsewhere by their residents." *Id.* at 11. ACTC argues that, here, the City should have credited the Wilmington Tax and the remainder of the DIT which did not offset the PIT against Appellant's Philadelphia Tax liability, in order to place Appellant on "the same tax liability as . . . a Pennsylvania resident with the same income who worked solely in Philadelphia." *Id.* at 13.

*F. J. Busse Co. v. City of Pittsburgh*, 279 A.2d 14, 18 (Pa. 1971) (determining that a local tax was not duplicative of the state tax). The City asks our Court to uphold this view, stressing that the Philadelphia Tax is a local tax which was enacted via an ordinance passed by Philadelphia's City Council, and is administered, collected, and distributed by the Department solely for the benefit of the City and its citizenry. Indeed, the City argues that a municipality's status as a creature of the state — and its attendant authority to impose only such taxes as are permitted by the Commonwealth — "in no way converts a purely local tax into a state tax." City's Brief at 14. In the City's summation, "the [d]ormant Commerce Clause does not require the City of Philadelphia to subsidize Delaware's decision to impose a higher tax rate on [Appellant] than the Commonwealth of Pennsylvania." *Id.* at 17.

Critically, the City contends that Appellant has failed to provide any case law which actually supports her argument that state and local taxes must be assessed unitarily for dormant Commerce Clause purposes. In that regard, the City maintains that Appellant misconstrues *Philadelphia Eagles*, *Northwood Construction*, and *7-Eleven*, as, according to the City, those decisions merely affirmed that localities imposing taxes must satisfy the requirements of the dormant Commerce Clause, including by providing credit for taxable activity which occurred outside of the taxing jurisdiction, which the City stresses that it did here. The City expounds that, in that trio of cases, this Court and the Commonwealth Court "did not address whether local taxes and state taxes must be aggregated because that question was not before any of the Courts." City's Brief at 18 (emphasis omitted).

Moreover, the City asserts that Appellant persistently misinterprets *Wynne*, as, therein, the high Court did not find Maryland's tax scheme unconstitutional on the basis that state and local taxes must be considered in tandem, but, rather, it condemned Maryland's tax scheme because Maryland's "county" tax was actually a duplicative state

tax against which the state refused to offer credit for out-of-state taxes paid. The City, thus, maintains that the manner in which the "county" tax functioned (*i.e.*, it was enacted by the state legislature and administered, collected, and distributed by Maryland's Comptroller) rendered it a state tax in disguise, whereas the Philadelphia Tax is a purely local tax which is administered, collected, and distributed by the Department, and was enacted by the Philadelphia City Council.

Contemplating Appellant's claim that she was subjected to double taxation, the City argues that the Department provided Appellant a full credit for income taxes paid to Wilmington, leading her to incur only the same 3.922% Philadelphia Tax rate as a Philadelphia resident working entirely in Philadelphia. From the City's perspective, the flaw in Appellant's double taxation claim is palpable "when you consider what the outcome would be if neither Wilmington nor Philadelphia had an income tax and [Appellant] was only subject to Delaware and Pennsylvania income taxes." *Id.* at 22. Specifically, the City points out that, under such circumstances, Appellant would be taxed at Delaware's rate of 5% and would receive a credit from Pennsylvania equal to its tax rate of 3.07%, such that Appellant would still incur a tax rate that is 1.93% higher than her in-state cohorts (namely, Delaware's full 5%). The City emphasizes that this scenario would present no dormant Commerce Clause violation, as Pennsylvania would not be expected to issue a further refund to account for Delaware's higher tax rate. In the City's view, then, "[t]he Commonwealth Court correctly applied the same logic to the instant matter and found that there was no double taxation because '[Appellant] never pays more than one local tax or more than one state tax.'" *Id.* at 23 (quoting *Zilka*, 1063-1064 C.D. 2019, at 5).

The City next addresses the *Complete Auto* test, preliminarily suggesting that the two prongs thereof which are relevant in this case (specifically, the discrimination and fair

apportionment prongs) address the same issue — the risk of double taxation. To that end, the City asserts that the discrimination prong of the test is subsumed by the fair apportionment prong, as the former prevents states from "discriminat[ing] against interstate commerce either by providing a direct commercial advantage to local business, or by subjecting interstate commerce to the burden of 'multiple taxation,'" *Nw. States Portland Cement Co.*, 358 U.S. at 458 (citations and internal citations omitted), while the latter ensures that "there is no danger of interstate commerce being smothered by cumulative taxes of several states," *Complete Auto*, 430 U.S. at 277. The City contends that, here, there is no risk of double taxation, as the Philadelphia Tax meets both the internal and external consistency tests of the fair apportionment prong of *Complete Auto*.

Maintaining that the Philadelphia Tax is internally consistent, the City reasons that all taxpayers would face the same local income tax rate of 3.922% if every local taxing authority in the nation imposed Philadelphia's taxation scheme — collecting wage taxes on income earned by residents within the jurisdiction and on income earned by residents working outside of that taxing authority's jurisdiction, but allowing the latter a credit against their local wage taxes for wage taxes paid to out-of-state local taxing authorities. Furthermore, the City argues that the result remains the same when the analysis is expanded to assume that all states adopt Pennsylvania's state income tax rate of 3.07%, as well as its practice of providing credit against an individual's income tax liability for income taxes paid out-of-state. Critically, the City contends that Appellant "continues to offer a distorted version of the internal consistency test" in reaching her conclusion that the Philadelphia Tax is unconstitutional, City's Brief at 28, as she utilized a hypothetical scenario in which every taxing jurisdiction adopts a different tax rate, as opposed to the correct hypothetical in which every taxing jurisdiction adopts the same practice *and* the same tax rate, *id.* at 32. Thus, according to the City, "[w]hen the internal consistency test

is applied correctly – using identical tax rates – Philadelphia's (and Pennsylvania's) [income tax] schemes satisfy the internal consistency test." *Id.*

Likewise, the City claims that its tax scheme is externally consistent, as the City has authority to tax all of Appellant's income, wherever earned, based on her domicile in Philadelphia. *See Okla. Tax. Cmm'n v. Chickasaw Nation*, 515 U.S. 450, 463 (1995) ("Domicile itself affords a basis for . . . taxation."). In any event, the City asserts that it "negates any claim of unfair apportionment or double taxation" by "provid[ing] a credit for a resident's out-of-state activity." City's Brief at 33 (citing, *inter alia*, *House of Lloyd v. Commonwealth*, 684 A.2d 213, 217 (Pa. Cmwlth. 1996) ("The Commonwealth's use tax is fairly apportioned in that it includes the customary provisions against duplication, including a credit for sales tax paid to another state."); *Goldberg,* 488 U.S. at 264 ("The . . . taxing scheme is fairly apportioned, for it provides a credit against its use tax for sales taxes that have been paid in other States." (ellipses original))). Lastly, the City maintains that *Philadelphia Eagles*, *Northwood Construction*, and *7-Eleven* do not support Appellant's argument that the full credit she received for her Wilmington Tax is insufficient to satisfy the external consistency test. Indeed, the City contends that this trio of cases is distinguishable from the instant matter because, in each of those cases, "the offending jurisdiction failed to give any credit for taxes paid to another jurisdiction," *id.* at 34, whereas, here, "the City provided full credit for any out-of-jurisdiction activity, satisfying the external consistency test," *id.* at 35. Accordingly, in light of the foregoing, the City asks our Court to affirm the decision of the court below.[8]

---

[8] The Pennsylvania Department of Revenue ("PDOR") submitted an *amicus* brief in support of the City. Therein, PDOR avers that the Commonwealth Court properly applied the *Complete Auto* test and found this matter distinguishable from *Wynne*. Countering Appellant's *Complete Auto* assessment, PDOR argues that the City's tax scheme meets the internal consistency test because, unlike the Maryland tax scheme in *Wynne*, the City offsets the Philadelphia Tax by granting residents credit for taxes paid to other local (continued…)

jurisdictions, such as Wilmington. In that regard, PDOR emphasizes that, if the Philadelphia/Pennsylvania tax scheme was applied in every jurisdiction, no resident would ever be subject to double taxation, thus demonstrating internal consistency. PDOR explains that any heightened tax burden on Appellant versus that incurred by her intrastate peers stems from the interaction of two different — but nondiscriminatory — tax schemes, which is permissible under the dormant Commerce Clause.

PDOR next highlights that, while the external consistency test has been employed by the high Court in corporate tax cases and sales tax cases, *Wynne* presented the Court with the first opportunity to apply the test in the context of a resident-based individual income tax, but the Court declined to do so, finding that the tax in question failed the internal consistency test. Moreover, PDOR notes that the *Wynne* Court "endorse[d] the ability of a resident state to tax all of its resident's income, so long as it does not run afoul of the internal consistency test." PDOR's Brief at 14 (emphasis omitted) (citing *Wynne*, 575 U.S. at 566-68). Hence, PDOR concludes that "there is no clear holding in *Wynne* that a residence-based income tax must be externally consistent." *Id.* at 15.

PDOR additionally directs our Court to Justice Ginsburg's dissenting opinion in *Wynne*, and the hypothetical "fix" she offered — specifically, Justice Ginsburg suggested that Maryland could amend its tax code to eliminate the special non-resident tax and simply continue taxing all residents' income regardless of source, *Wynne*, 575 U.S. at 582 (Ginsburg, J., dissenting) — with which the *Wynne* majority ultimately acquiesced, *see id.* at 568-69 (majority opinion). PDOR explains that, in its view, the *Wynne* Court could not have envisioned applying the external consistency test in the context of a resident-based individual income tax, as this "fix" would indubitably fail the test. PDOR submits that a recent Utah Supreme Court decision, *Steiner v. Utah State Tax Comm'n*, 449 P.3d 189, 197 (Utah 2019) (opining that the *Wynne* Court "strongly implied that tax systems that fail external consistency would nonetheless pass constitutional muster"), underscores its reasoning in this regard.

In any event, PDOR agrees with the Commonwealth Court's determination that the Philadelphia Tax is externally consistent because the City provides its residents with tax credit for wage taxes paid to outside jurisdictions and, in so doing, does not tax more than its fair share of residents' income. In PDOR's view, the City "is economically justified [in] taxing a resident on all of his income because residents receive all of the protections and benefits afforded by the resident jurisdiction, *e.g.*, fire, police, public utilities." PDOR's Brief at 18.

Lastly, PDOR avers that our Court's adoption of Appellant's argument would detrimentally impact state and local tax revenues "without any clear indication from the U.S. Supreme Court that such a result is mandated." *Id.* at 19. PDOR submits that Appellant's argument, if adopted, would require "the Commonwealth and its political subdivisions, which have lower tax rates, to export their tax revenues to bordering states and jurisdictions with higher tax rates," thus threatening "the Commonwealth's 'fiscal well-being'" and encouraging our government "to increase its tax rates to keep from losing (continued…)

## IV. Analysis

As an initial matter, we emphasize that the question of aggregation for purposes of a dormant Commerce Clause analysis is a matter of first impression for this Court. To that end, we reject Appellant's assertion that *Philadelphia Eagles*, *Northwood Construction*, and *7-Eleven* demonstrate that this Court and the Commonwealth Court "have consistently recognized that a Commerce Clause analysis *must* examine the local tax as it relates to the state tax." Appellant's Brief at 17 (emphasis original). In this trio of cases, neither our Court nor the lower court pronounced that local and state taxes must be aggregated in conducting a *Complete Auto* analysis under the dormant Commerce Clause; thus, these cases do not control our initial query.[9] Instead, we place paramount importance on the high Court's decision in *Wynne*, which we find to be instructive on the question of aggregation. Based thereon, we find that, in addressing Appellant's dormant Commerce Clause challenge, we must examine the circumstances surrounding the Philadelphia Tax in order to determine whether it is truly a local tax or is, instead, a state tax masquerading as a local tax.

As noted, in *Wynne*, the high Court found that Maryland's "county" tax was essentially little more than a state tax masquerading as a local tax, given that the state imposed the tax via state legislation and the state's comptroller collected the tax. *See Wynne*, 575 U.S. at 546. In our view, the Court's logic and characterization of the county tax as a state tax based on the circumstances underlying its creation and the manner of its collection via the state's comptroller reveal that state and local taxes need not be

---

revenue to other states." *Id.* at 21. Accordingly, PDOR urges our Court to affirm the decision of the Commonwealth Court.

[9] We similarly find that *Lohman*, *supra*, is not relevant to our consideration of this issue, as it does not address the need, *vel non*, to aggregate state and local taxes in a dormant Commerce Clause analysis.

aggregated for purposes of a dormant Commerce Clause analysis, as Appellant contends. Indeed, nowhere in its comprehensive opinion did the *Wynne* Court endorse the notion that local taxes are essentially a legal fiction, indistinguishable from state taxes. Rather, in our view, the Court sanctioned an *ad hoc* approach, under which a "local" income tax may be deemed indistinguishable from the corresponding state's income tax only if, like Maryland's "county" tax, it is actually a duplicative state tax in disguise.

Here, the Philadelphia Tax is readily distinguishable from the county tax at issue in *Wynne*, as the latter was enacted by the State of Maryland and collected by Maryland's comptroller, whereas the Philadelphia Tax was enacted by Philadelphia's City Council and is collected by the City's Department of Revenue solely for the benefit of the City and its citizenry. In light of this stark contrast, we reject Appellant's argument that *Wynne* mandates that we aggregate the Philadelphia Tax with the PIT in discerning whether it violates the dormant Commerce Clause, as her view in that regard is contrary to the high Court's teachings in *Wynne*.

We likewise reject Appellant's claim that the City was required to aggregate the Philadelphia Tax and the PIT because local governments, such as the City, are creatures of statute, which derive taxation authority solely from the legislative enactments of our General Assembly. It is axiomatic that "[t]he validity of the taxing ordinance does not depend upon whether the tax is regarded in a legal sense as a state or local tax," given that "[a]ll taxes in Pennsylvania levied by municipal and quasi municipal corporations must, of course, be authorized by the legislature." *McClelland*, 57 A.2d at 848. Indeed, our Court has recognized that, "*[i]n that sense*, therefore, all [taxes] may be considered state taxes." *Id.* (emphasis original). Nevertheless, although our Court has acknowledged that, *in a sense*, state and local taxes are indistinguishable, as both are authorized by state legislation, we have also stressed that "[s]tate taxes stand on a

different basis from local levies." *Id.* In that vein, we have highlighted that state taxes "are essential to the very 'preservation' of the state itself," whereas local taxes "are authorized or permitted by the state, not for its actual preservation, but merely to maintain the machinery of local government." *Id.* (internal citations omitted); *see Nat'l Biscuit*, 98 A.2d at 186 (observing that, in *McClelland*, we concluded that "a tax imposed for the benefit merely of a local political subdivision, and not for general State purposes, is not to be regarded as a State tax"). Thus, nothing in the high Court's teachings, nor in our own jurisprudence, stands for the premise that state and local taxes are broadly indistinguishable, much less supports Appellant's conclusion that state and local taxes *must* be aggregated for purposes of a dormant Commerce Clause analysis.

Aside from her reliance on *Wynne*, which, as explained above, undermines her argument in favor of aggregation, and *Philadelphia Eagles*, *Northwood Construction*, and *7-Eleven*, which are inapposite to the issue, Appellant provides little else to justify her view that we must consider the Philadelphia Tax in tandem with the PIT in addressing her dormant Commerce Clause challenge. In her final effort to sway this Court with respect to the question of aggregation, Appellant proffers three out-of-state cases — *Arizona Public Service*, *supra*; *General Motors*, *supra*; and *Matkovich*, *supra*. In the first of these cases, an Arizona court of appeals held that an Arizona public utility company which purchased coal from a mine located in McKinley County, New Mexico, was entitled to tax credits, against the amount it paid in Arizona's use tax, for gross receipts taxes which the company paid to both New Mexico and McKinley County. In so concluding, the Arizona court of appeals examined A.R.S. § 42-1409,[10] which governed the state's use tax and provided an express exemption whereby the use tax did not apply to "[t]angible personal

---

[10] Section 42-1409 was renumbered following the court's decision in *Arizona Public Service.*

property the sale or use of which has already been subjected to an excise tax at a rate equal to or exceeding the tax imposed by this article under the laws of another state of the United States." *Id.* § 42-1409(A)(2). The provision further provided that, "[i]f the excise tax imposed by the other state is at a rate less than the tax imposed by this article, the tax imposed by this article is reduced by the amount of the tax already imposed by the other state." *Id.* The court found that the plain language of the statute — crediting a taxpayer for excise taxes paid on personal property "under the laws of another state" to offset Arizona's use tax — required it to exempt the utility company from the use tax for the gross receipts taxes paid to both the State of New Mexico and McKinley County. With respect to the latter taxing authority, the court observed that the county was entitled to impose its gross receipts tax on taxpayers solely by virtue of its "derivative relationship" with the state, and, more precisely, from the state's enabling statutes. *Ariz. Pub. Serv. Co.*, 934 P.2d at 799. Tellingly, however, the court concluded that this relationship between the state and county revealed that the word "under," as employed by Arizona's legislature in Section 42-1409(A)(2), was unambiguous and justified an exemption for the gross receipts tax which the utility company paid to McKinley County.

While the Arizona intermediate court briefly mentioned the Commerce Clause in its disposition of the tax issue before it, its focus, undoubtedly, was on the language of its state's legislation, and it is that legislation which governed the outcome of the case. As such, *Arizona Public Service* does not support the novel practice of aggregating state and local taxes for purposes of a dormant Commerce Clause analysis.

Likewise, *General Motors* is of limited value. Therein, the Colorado Supreme Court was tasked with determining whether a use tax imposed by the City and County of Denver violated the dormant Commerce Clause. In finding that it did, the court preliminarily concluded that "[i]nternal consistency [under *Complete Auto*] requires that states impose

identical taxes when viewed in the aggregate — as a collection of state and sub-state taxing jurisdictions." *General Motors*, 990 P.2d at 69. Markedly, this brief conclusory statement represents the entirety of the court's reasoning, or lack thereof, underlying its determination that state and local taxes must be aggregated for consideration under the dormant Commerce Clause. Thus, *General Motors* provides a poor basis on which for our Court to declare, for the first time, that state and local level taxes are one and the same for purposes of the Commerce Clause.[11]

---

[11] Notably, the *General Motors* court also erroneously employed the *Complete Auto* test. Specifically, in attempting to discern whether Denver's taxation scheme was internally consistent, the court provided the following hypothetical scenario:

> [I]f Colorado imposed a 1% sales or use tax and Denver a 2% tax, a purchaser or user would owe a 3% total tax. Similarly, if Michigan collected a 2% sales or use tax and Detroit a 1% tax, a purchaser or user in Detroit would pay a 3% total tax. However, a user who purchased the item in Detroit would be subject to an additional 1% tax upon the storage or use of the item in Denver because section 53–92(c) only credits taxes paid to other municipalities. Thus, Denver's use tax could burden interstate commerce if every other state and municipality employed the same tax structure as Colorado and Denver, but imposed different tax rates.

*General Motors*, 990 P.2d at 70. This is an inaccurate application of the internal consistency test, as the Colorado Supreme Court invented a scenario with "similar" tax schemes in Colorado and Michigan, but with differing rates of taxation, and which are inverted such that Colorado's tax rate matched that of Detroit, and Michigan's tax rate matched the rate imposed by Denver. The court was correct that this scenario could have led to double taxation, as an individual who purchased an item in Detroit would have received a 1% credit against his or her Denver tax, leaving 1% remaining. Based on its view in this regard, the court reasoned that Denver's tax structure was "internally inconsistent because Denver's credit mechanism could cause multiple taxation even if every state and municipality were to impose a taxing scheme *similar* to the one present in Colorado and Denver." *Id.* at 69 (emphasis added).

Yet, the internal consistency test does not operate, as the Colorado Supreme Court suggested, in terms of "similar taxes." Rather, the appropriate question, which we address below, is whether an individual would be subject to double taxation if all states and local taxing authorities were to adopt the *same* taxes and crediting systems as Pennsylvania and Philadelphia. *See Wynne*, 575 U.S. at 562 ("This test, which helps (continued…)

The third and final out-of-state case on which Appellant relies, *Matkovich*, also provides negligible support for her claim that state and local income taxes must be viewed as one under the dormant Commerce Clause. In *Matkovich*, the West Virginia Supreme Court concluded that a tax credit statute, W. Va. Code § 11-15A-10a, which operated to offset the state's motor fuel use tax, violated the dormant Commerce Clause because the state's tax department applied the statute in a manner which provided a taxpayer credit only for sales taxes paid on fuel to other states and not for such taxes paid to cities, counties, and localities of other states. Relying on *Wynne*, *Arizona Public Service*, and *General Motors*, the court found that proper application of the statute entitled taxpayers to receive sales tax credits for sales taxes paid to other states and to subdivisions of other states. In so doing, the court opined that "[a]ny other construction of th[e] statute would invariably violate the Commerce Clause's prohibition on subjecting interstate transactions to a greater tax burden than that imposed on strictly intrastate dealings." *Matkovich*, 793 S.E.2d at 897. We are unpersuaded by *Matkovich*, given that the court therein derived support for its conclusion from *Arizona Public Service*, which, as discussed, is distinguishable from the instant case, and from *General Motors*, which, as noted, concluded that state and local taxes must be aggregated without citing any authority or undertaking any semblance of a substantive analysis with respect to the issue. Moreover, we find that the *Matkovich* court's ruling contravenes the high Court's reasoning in *Wynne*, which, as explained, requires an *ad hoc* assessment of the local income tax scheme at issue to discern whether it is distinct from the corresponding state income tax or indistinguishable therefrom for purposes of a *Complete Auto* analysis.

---

courts identify tax schemes that discriminate against interstate commerce, looks to the structure of the tax at issue to see whether its *identical* application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate." (emphasis added; citations and internal quotation marks omitted)).

Thus, Appellant has failed to persuade us that her construction of the dormant Commerce Clause aligns with *Wynne*, and these three out-of-state cases do not sway us in her favor. Accordingly, consistent with *Wynne*, we conclude that the Philadelphia Tax was enacted, and operates, as a purely local tax, given that it was promulgated by Philadelphia's City Council and is collected by the Department for the sole benefit of the City and its residents; as a result, we will not consider these state and local taxes in the aggregate in applying the *Complete Auto* test.

Having determined that the Philadelphia Tax and the PIT should be treated as discrete taxes, we must consider whether the City's tax scheme discriminates against interstate commerce. We conclude, as did the Commonwealth Court, that the Philadelphia Tax and the City's corresponding crediting system satisfy the test set forth in *Complete Auto*.

As explained above, Appellant challenges the Philadelphia Tax under two prongs of the *Complete Auto* test: first, she contends that the City's tax scheme is not fairly apportioned; and second, she avers that the tax scheme discriminates against interstate commerce. In assessing whether the tax scheme is fairly apportioned, we must determine whether it is internally and externally consistent. Once more, the high Court's decision in *Wynne* provides clear guidance with respect to this endeavor.

To briefly reiterate, the *Wynne* Court found that Maryland's tax scheme was not internally consistent because, if every state adopted the three taxes at issue (the county tax, the state tax, and the special non-resident tax) and adopted Maryland's system of not crediting against those taxes, residents who paid income tax to out-of-state jurisdictions would incur double taxation. *Wynne*, 575 U.S. at 565. The Court stressed that such double taxation was "not simply the result of [the tax scheme's] interaction with the taxing schemes of other States," but, instead, emanated from inherent discrimination contained

within the scheme. *Id.* (citations omitted). Pertinently, in declaring Maryland's tax scheme unconstitutional, the Court explained that "Maryland could remedy the infirmity in its tax scheme by offering, as most States do, a credit against income taxes paid to other States," which would vindicate the tax scheme under the internal consistency test. *Id.* at 568 (citation omitted).

In accordance with *Wynne*, we must now determine whether the City's tax scheme is internally consistent. To do so, we must assume that all local taxing jurisdictions adopt the Philadelphia Tax rate of 3.922% and the City's corresponding practice of crediting taxpayers for local taxes paid to other jurisdictions. In this scenario, April, who lives in State A and works exclusively in State A, would pay 3.922% once to State A, while Bob, who lives in State A but works in State B, would also pay only 3.922% once, to State B, because State A would permit him a credit against its own tax. Thus, both in-state and out-of-state taxpayers would yield the same tax obligation. The same remains true even if we add the Commonwealth's state tax to this hypothetical, as each taxpayer would simply incur an additional state tax obligation of 3.07% consistent with the PIT and the Commonwealth's corresponding practice of offsetting the PIT with state taxes paid elsewhere. Accordingly, when the internal consistency test is properly applied to the Philadelphia Tax and the PIT, along with the corresponding tax credits permitted by the City and the Commonwealth, it is evident that any remaining "disparate incentives to engage in interstate commerce" stem solely from "the interaction of two different but nondiscriminatory and internally consistent schemes." *Id.* at 562 (citations omitted); *see Steiner*, 449 P.3d at 197 (finding that, because Utah offered a tax credit for out-of-state taxes, it was internally consistent and compatible with *Wynne*); *Goggin v. State Tax Assessor*, 191 A.3d 341, 347 (Me. 2018) ("Here, the Maine statute expressly allows a

credit for the payment of individual income taxes to other states . . . and therefore does not run afoul of *Wynne.*").

Hence, the Commonwealth Court correctly determined that any excess taxes paid by Appellant were simply the result of Delaware's higher income tax rate of 5%, rather than any inherent discrimination contained in the Philadelphia Tax or the City's practice of offsetting its tax with credits paid only to local taxing jurisdictions. A simple hypothetical bolsters our conclusion in this regard: If neither Philadelphia nor Wilmington imposed a local wage tax, Appellant would have nonetheless paid 1.93% more in income taxes than her Pennsylvania counterparts who worked solely in the Commonwealth, as the DIT rate was 5% while the PIT rate was 3.07%. In this hypothetical, Commerce Clause principles would not have required the Commonwealth to credit Appellant beyond the 3.07% which it already permitted her, nor would Delaware incur any similar obligation to lessen Appellant's tax burden, given that states may set their own income tax rates. Certainly, the City should not be required to subsidize Delaware's higher tax rate when it already offsets its Wage Tax by crediting taxpayers for analogous local taxes paid outside of its jurisdiction. For these reasons, we find that the Philadelphia Tax meets the internal consistency test, and that, relatedly, the tax is not discriminatory under the third prong of the *Complete Auto* test because the City imposes a consistent tax on all residents and provides the necessary credit against similar out-of-state local taxes paid by them. *See Armco Inc.,* 467 U.S. at 644 (commingling consideration of the internal consistency test and the discrimination prong of the *Complete Auto* test because "[a] tax that unfairly apportions income from other States is a form of discrimination against interstate commerce"); *see also* City's Brief at 25-26 (advocating that the discrimination and fair apportionment prongs of the *Complete Auto* test merge).

Additionally, we find that the Philadelphia Tax meets *Complete Auto's* external consistency test, which examines "the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Jefferson Lines*, 514 U.S. at 185. It is well-established that "domicile in itself establishes a basis for taxation" because the "[e]njoyment of the privileges of residence within the state, and the attendant right to invoke the protection of its laws, are inseparable from the responsibility for sharing the costs of government." *Lawrence*, 286 U.S. at 279. Indeed, "[a] tax measured by the net income of residents is an equitable method of distributing the burdens of government," which include public education and emergency services, "among those who are privileged to enjoy its benefits." *People of State of N.Y. ex rel. Cohn v. Graves*, 300 U.S. 308, 313 (1937). Consequently, we agree with the lower court that "Philadelphia's provision of municipal benefits and services to its residents provides sufficient economic justification for the imposition of its Wage Tax." *Zilka*, 1063-1064 C.D. 2019, at 9 (citation omitted). Moreover, as the lower court explained, "Philadelphia avoided taxing more than its fair share of [Appellant's] wages by providing a tax credit for 100% of the Wilmington Tax." *Id.* Thus, we find that the City's tax scheme is externally consistent under *Complete Auto*.

For these reasons, we conclude that the City did not violate the dormant Commerce Clause by imposing upon Appellant the Philadelphia Tax, crediting her for the similar local tax she paid to Wilmington, but declining to afford her an additional credit for the state taxes she paid to Delaware, as the tax scheme is both internally and externally consistent and is not discriminatory against interstate commerce, in conformance with the *Complete Auto* test. To hold otherwise would, in effect, nullify the high Court's venerable recognition that "tax schemes that create disparate incentives to engage in interstate commerce (and sometimes result in double taxation) only as a result of the interaction of

two different but nondiscriminatory and internally consistent schemes" are not unconstitutional. *Wynne*, 575 U.S. at 562. Accordingly, we affirm the Commonwealth Court's decision concluding that the tax scheme is constitutional.

Justices Donohue and Wecht join the opinion.

Justice Wecht files a concurring opinion.

Justice Dougherty files a dissenting opinion in which Justice Mundy joins.

Justice Brobson did not participate in the consideration or decision of this matter.